OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 Although
 
 in vitro
 
 fertilization (IVF) procedures are now
 
 *557
 
 more than two decades old and in wide use, this is the first such dispute to reach our Court. Specifically in issue is the disposition of five frozen, stored pre-embryos, or “pre-zygotes,”
 
 [1]
 
 created five years ago, during the parties’ marriage, to assist them in having a child. Now divorced, appellant (Maureen Kass) wants the pre-zygotes implanted, claiming this is her only chance for genetic motherhood; respondent (Steven Kass) objects to the burdens of unwanted fatherhood, claiming that the parties agreed at the time they embarked on the effort that in the present circumstances the pre-zygotes would be donated to the IVF program for approved research purposes. Like the two-Justice plurality at the Appellate Division, we conclude that the parties’ agreement providing for donation to the IVF program controls. The Appellate Division order should therefore be affirmed.
 

 Facts
 

 Appellant and respondent were married on July 4, 1988, and almost immediately began trying to conceive a child. While appellant believed that, owing to prenatal exposure to diethylstilbestrol (DES) she might have difficulty carrying a pregnancy to term, her condition in fact was more serious — she failed to become pregnant. In August 1989, the couple turned to John T. Mather Memorial Hospital in Port Jefferson, Long Island and, after unsuccessful efforts to conceive through artificial insemination, enrolled in the hospital’s IVF program.
 

 Typically, the IVF procedure begins with hormonal stimulation of a woman’s ovaries to produce multiple eggs. The eggs are then removed by laparoscopy or ultrasound-directed needle aspiration and placed in a glass dish, where sperm are introduced. Once a sperm cell fertilizes the egg, this fusion — or pre-zygote — divides until it reaches the four- to eight-cell stage, after which several pre-zygotes are transferred to the woman’s uterus by a cervical catheter. If the procedure succeeds, an embryo will attach itself to the uterine wall, differentiate and develop into a fetus. As an alternative to immediate implantation, pre-zygotes may be cryopreserved indefinitely in liquid nitrogen for later use. Cryopreservation serves to reduce both medical and physical costs because eggs do not have to be retrieved with each attempted implantation, and delay may actually improve the chances of pregnancy. At the same time,
 
 *558
 
 the preservation of “extra” pre-zygotes — those not immediately implanted — allows for later disagreements, as occurred here.
 

 Beginning in March 1990, appellant underwent the egg retrieval process five times and fertilized eggs were transferred to her nine times. She became pregnant twice — once in October 1991, ending in a miscarriage and again a few months later, when an ectopic pregnancy had to be surgically terminated.
 

 Before the final procedure, for the first time involving cryopreservation, the couple on May 12, 1993 signed four consent forms provided by the hospital. Each form begins on a new page, with its own caption and “Patient Name.” The first two forms, “general informed consent form no. 1: in vitro FERTILIZATION AND EMBRYO TRANSFER” and “ADDENDUM NO. 1-1,” consist, of 12 single-spaced typewritten pages explaining the procedure, its risks and benefits, at several points indicating that, before egg retrieval could begin, it was necessary for the parties to make informed decisions regarding disposition of the fertilized eggs, addendum no. 1-1 concludes as follows:
 

 “We understand that it is general IVF Program Policy, as medically determined by our IVF physician, to retrieve as many eggs as possible and to inseminate and transfer 4 of those mature eggs in this IVF cycle, unless our IVF physician determines otherwise. It is necessary that we decide * * * [now] how excess eggs are to be handled by the IVF Program and how many embryos to transfer.
 
 We are to indicate our choices by signing our initials where noted below.
 

 “1. We consent to the retrieval of as many eggs as medically determined by our IVF physician. If more eggs are retrieved than can be transferred during this IVF cycle, we direct the IVF Program to take the following action (choose one):
 

 “(a) The excess eggs are to be inseminated and cryopreserved for possible use by us during a later IVF cycle. We understand that our choice of this option requires us to complete an additional Consent Form for Cryopreservation” (emphasis in original).
 

 The “Additional Consent Form for Cryopreservation,” a seven-page, single-spaced typewritten document, is also in two parts. The first, “informed consent form no. 2: cryopreservation of human pre-zygotes,” provides:
 

 
 *559
 
 “III.
 
 Disposition of Pre-Zygotes.
 

 “We understand that our frozen pre-zygotes will be stored for a maximum of 5 years. We have the principal responsibility to decide the disposition of our frozen pre-zygotes. Our frozen pre-zygotes will not be released from storage for any purpose without the written consent of
 
 both
 
 of us, consistent with the policies of the IVF Program and applicable law. In the event of divorce, we understand that legal ownership of any stored pre-zygotes must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction. Should we for any reason no longer wish to attempt to initiate a pregnancy, we understand that we may determine the disposition of our frozen pre-zygotes remaining in storage. * * *
 

 “The possibility of our death or any other unforeseen circumstances that may result in neither of us being able to determine the disposition of any stored frozen pre-zygotes requires that we now indicate our wishes, these important decisions MUST BE DISCUSSED WITH OUR IVF PHYSICIAN AND OUR WISHES MUST BE STATED (BEFORE EGG RETRIEVAL) ON THE ATTACHED ADDENDUM NO. 2-1, STATEMENT OF DISPOSITION. THIS STATEMENT OF DISPOSITION MAY BE CHANGED ONLY BY OUR SIGNING ANOTHER STATEMENT OF DISPOSITION WHICH IS FILED WITH THE IVF PROGRAM” (emphasis in original).
 

 The second part, titled “informed consent form no. 2 — addendum NO. 2-1: CRYOPRESERVATIONSTATEMENT OF DISPOSITION,” states:
 

 “We understand that it is IVF Program Policy to obtain our informed consent to the number of prezygotes which are to be cryopreserved and to the disposition of excess cryopreserved pre-zygotes. We
 
 are to indicate our choices by signing our initials where noted below.
 

 “1. We
 
 consent to cryopreservation of all prezygotes which are not transferred during this IVF cycle for possible use * * * by us in a future IVF cycle. * * *
 

 “2. In the event that we no longer wish to initiate a
 
 *560
 
 pregnancy or are unable to make a decision regarding the disposition of our stored, frozen pre-zygotes, we now indicate our desire for the disposition of our pre-zygotes and direct the IVF program to (choose one): * * *
 

 “(b) Our frozen pre-zygotes may be examined by the IVF Program for biological studies and be disposed of by the IVF Program for approved research investigation as determined by the IVF Program” (emphasis in original).
 

 On May 20, 1993, doctors retrieved 16 eggs from appellant, resulting in nine pre-zygotes. Two days later, four were transferred to appellant’s sister, who had volunteered to be a surrogate mother, and the remaining five were cryopreserved. The couple learned shortly thereafter that the results were negative and that appellant’s sister was no longer willing to participate in the program. They then decided to dissolve their marriage. The total cost of their IVF efforts exceeded $75,000.
 

 With divorce imminent, the parties themselves on June 7, 1993 — barely three weeks after signing the consents — drew up and signed an “uncontested divorce” agreement, typed by appellant, including the following:
 

 “The disposition of the frozen 5 pre-zygotes at Mather Hospital is that they should be disposed of [in] the manner outlined in our consent form and that neither Maureen Kass[,] Steve Kass or anyone else will lay claim to custody of these pre-zygotes.”
 

 On June 28, 1993, appellant by letter informed the hospital and her IVF physician of her marital problems and expressed her opposition to destruction or release of the pre-zygotes.
 

 One month later, appellant commenced the present matrimonial action, requesting sole custody of the pre-zygotes so that she could undergo another implantation procedure. Respondent opposed removal of the pre-zygotes and any further attempts by appellant to achieve pregnancy, and counterclaimed for specific performance of the parties’ agreement to permit the IVF program to retain the pre-zygotes for research, as specified in addendum no. 2-1. By stipulation dated December 17, 1993, the couple settled all issues in the matrimonial action except each party’s claim with respect to the prezygotes, which was submitted to the court for determination. While this aspect of the case remained open, a divorce judgment was entered on May 16, 1994.
 

 
 *561
 
 In connection with the continuing litigation over the prezygotes, by letter dated January 9, 1995 the parties agreed that the matter should be decided on the existing record.
 

 Supreme Court granted appellant custody of the pre-zygotes and directed her to exercise her right to implant them within a medically reasonable time. The court reasoned that a female participant in the IVF procedure has exclusive decisional authority over the fertilized eggs created through that process, just as a pregnant woman has exclusive decisional authority over a nonviable fetus, and that appellant had not waived her right either in the May 12, 1993 consents or in the June 7, 1993 “uncontested divorce” agreement.
 

 While a divided Appellate Division reversed that decision (235 AD2d 150), all five Justices unanimously agreed on two fundamental propositions. First, they concluded that a woman’s right to privacy and bodily integrity are not implicated before implantation occurs. Second, the court unanimously recognized that when parties to an IVF procedure have themselves determined the disposition of any unused fertilized eggs, their agreement should control.
 

 The panel split, however, on the question whether the agreement at issue was sufficiently clear to control disposition of the pre-zygotes. According to the two-Justice plurality, the agreement unambiguously indicated the parties’ desire to donate the pre-zygotes for research purposes if the couple could not reach a joint decision regarding disposition. The concurring Justice agreed to reverse but found the consent fatally ambiguous. In his view, but for the most exceptional circumstances, the objecting party should have a veto over a former spouse’s proposed implantation, owing to the emotional and financial burdens of compelled parenthood. A fact-finding hearing would be authorized only when the party desiring parenthood could make a threshold showing of no other means of achieving genetic or adoptive parenthood, which was not shown on this stipulated record.
 

 While agreeing with the concurrence that the informed consent document was ambiguous, the two-Justice dissent rejected a presumption in favor of either party and instead concluded that the fate of the pre-zygotes required a balancing of the parties’ respective interests and burdens, as well as their personal backgrounds, psychological makeups, financial and physical circumstances. Factors would include appellant’s independent ability to support the child and the sincerity of
 
 *562
 
 her emotional investment in this particular reproductive opportunity, as well as the burdens attendant upon a respondent’s unwanted fatherhood and his motivations for objecting to parenthood. Finding that the record was insufficient to permit a fair balancing, and that the parties’ January 9, 1995 stipulation that there would be no further submissions violated public policy because it precluded full review, the dissent would remit the case to the trial court for a full hearing.
 

 We now affirm, agreeing with the plurality that the parties clearly expressed their intent that in the circumstances presented the pre-zygotes would be donated to the IVF program for research purposes.
 

 Analysis
 

 A.
 
 The Legal Landscape Generally.
 
 We begin analysis with a brief description of the broader legal context of this dispute. In the past two decades, thousands of children have been born through IVF, the best known of several methods of assisted reproduction. Additionally, tens of thousands of frozen embryos annually are routinely stored in liquid nitrogen canisters, some having been in that state for more than 10 years with no instructions for their use or disposal (see, New York State Task Force on Life and the Law,
 
 Assisted Reproductive Technologies: Analysis and Recommendations for Public Policy,
 
 at 289 [Apr. 1998]
 
 [“Assisted Reproductive
 
 Technologies”]; Caplan, Due Consideration: Controversy in the Age of Medical Miracles, at 63 [1998]). As science races ahead, it leaves in its trail mind-numbing ethical and legal questions (see
 
 generally,
 
 Robertson, Children of Choice: Freedom and the New Reproductive Technologies [1994] [“Children of Choice”]).
 

 The law, whether statutory or decisional, has been evolving more slowly and cautiously. A handful of States — New York not among them — have adopted statutes touching on the disposition of stored embryos (see,
 
 e.g.,
 
 Fla Stat Annot § 742.17 [couples must execute written agreement providing for disposition in event of death, divorce or other unforeseen circumstances]; NH Rev Stat Annot §§ 168-B:13 — 168-B:15, 168-B:18 [couples must undergo medical exams and counseling; 14-day limit for maintenance of
 
 ex utero
 
 pre-zygotes]; La Rev Stat An-
 
 *563
 
 not §§ 9:121-9:133 [pre-zygote considered “juridical person” that must be implanted]).
 
 [2]
 

 In the case law, only
 
 Davis v Davis
 
 (842 SW2d 588, 604 [Tenn 1992],
 
 cert denied sub nom. Stowe v Davis,
 
 507 US 911) attempts to lay out an analytical framework for disputes between a divorcing couple regarding the disposition of frozen embryos (see
 
 also, York v Jones,
 
 717 F Supp 421 [ED Va];
 
 Del Zio v Columbia Presbyt. Hosp.,
 
 1978 US Dist LEXIS 14450 [US Dist Ct, SD NY, Apr. 12, 1978, 74 Civ 3588];
 
 AZ v BZ,
 
 Mass Probate Ct, Mar. 25, 1996). Having declared that embryos are entitled to “special respect because of their potential for human life” (842 SW2d at 597,
 
 supra), Davis
 
 recognized the procreative autonomy of both gamete providers, which includes an interest in avoiding genetic parenthood as well as an interest in becoming a genetic parent. In the absence of any prior written agreement between the parties — which should be presumed valid, and implemented — according to
 
 Davis,
 
 courts must in every case balance these competing interests, each deserving of judicial respect. In
 
 Davis
 
 itself, that balance weighed in favor of the husband’s interest in avoiding genetic parenthood, which was deemed more significant than the wife’s desire to donate the embryos to a childless couple.
 

 Although statutory and decisional law are sparse, abundant commentary offers a window on the issues ahead, particularly suggesting various approaches to the issue of disposition of pre-zygotes. Some commentators would vest control in one of the two gamete providers
 
 (see, e.g.,
 
 Poole,
 
 Allocation of Decision-Making Rights to Frozen Embryos,
 
 4 Am J Fam L 67 [1990] [pre-zygotes to party wishing to avoid procreation]; Andrews,
 
 The Legal Status of the Embryo,
 
 32 Loy L Rev 357 [1986] [woman retains authority when she desires to implant]). Others would imply a contract to procreate from participation in an IVF program
 
 (see, e.g.,
 
 Note,
 
 Davis v. Davis: What About Future Disputes?,
 
 26 Conn L Rev 305 [1993]; Comment,
 
 Frozen Embryos: Towards An Equitable Solution,
 
 46 U Miami L Rev 803 [1992]).
 

 
 *564
 
 Yet a third approach is to regard the progenitors as holding a “bundle of rights” in relation to the pre-zygote that can be exercised through joint disposition agreements
 
 (see,
 
 Robertson,
 
 Prior Agreements for Disposition of Frozen Embryos,
 
 51 Ohio St LJ 407 [1990]
 
 [“Prior
 
 Agreements”]; Robertson,
 
 In the Beginning: The Legal Status of Early Embryos,
 
 76 Va L Rev 437 [1990]
 
 [“Early Embryos”]).
 
 The most recent view — a “default rule” — articulated in the report of the New York State Task Force on Life and the Law, is that, while gamete bank regulations should require specific instructions regarding disposition, no embryo should be implanted, destroyed or used in research over the objection of an individual with decision-making authority
 
 (see, Assisted Reproductive Technologies, op. cit.,
 
 at 317-320).
 

 Proliferating cases regarding the disposition of embryos, as well as other assisted reproduction issues, will unquestionably spark further progression of the law.
 
 [3]
 
 What is plain, however, is the need for clear, consistent principles to guide parties in protecting their interests and resolving their disputes, and the need for particular care in fashioning such principles as issues are better defined and appreciated. Against that backdrop we turn to the present appeal.
 

 B.
 
 The Appeal Before Us.
 
 Like the Appellate Division, we conclude that disposition of these pre-zygotes does not implicate a woman’s right of privacy or bodily integrity in the area of reproductive choice; nor are the pre-zygotes recognized as “persons” for constitutional purposes
 
 (see, Roe v Wade,
 
 410 US 113, 162;
 
 Byrn v New York City Health & Hosps. Corp.,
 
 31 NY2d 194, 203,
 
 appeal dismissed
 
 410 US 949). The relevant inquiry thus becomes who has dispositional authority over them. Because that question is answered in this case by the parties’ agreement, for purposes of resolving the present appeal we
 
 *565
 
 have no cause to decide whether the pre-zygotes are entitled to “special respect”
 
 (cf., Davis v Davis,
 
 842 SW2d 588, 596-597,
 
 supra; see also,
 
 Ethics Comm of Am Fertility Socy,
 
 Ethical Considerations of the New Reproductive Technologies,
 
 46 Fertility & Sterility 1S, 32S [Supp 1 1986]).
 
 [4]
 

 Agreements between progenitors, or gamete donors, regarding disposition of their pre-zygotes should generally be presumed valid and binding, and enforced in any dispute between them
 
 (see, Davis v Davis,
 
 842 SW2d at 597,
 
 supra; see also, Early Embryos, op. cit,
 
 76 Va L Rev at 463-469). Indeed, parties should be encouraged in advance, before embarking on IVF and cryopreservation, to think through possible contingencies and carefully specify their wishes in writing. Explicit agreements avoid costly litigation in business transactions. They are all the more necessary and desirable in personal matters of reproductive choice, where the intangible costs of any litigation are simply incalculable. Advance directives, subject to mutual change of mind that must be jointly expressed, both minimize misunderstandings and maximize procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision. Written agreements also provide the certainty needed for effective operation of IVF programs
 
 (see, Prior Agreements, op. cit.,
 
 51 Ohio St L Rev at 414-418;
 
 see also,
 
 Children of Choice,
 
 op. cit,
 
 at 107, 113).
 

 While the value of arriving at explicit agreements is apparent, we also recognize the extraordinary difficulty such an exercise presents. All agreements looking to the future to some extent deal with the unknown. Here, however, the uncertainties inherent in the IVF process itself are vastly complicated by cryopreservation, which extends the viability of pre-zygotes indefinitely and allows time for minds, and circumstances, to change. Divorce; death, disappearance or incapacity of one or both partners; aging; the birth of other children are but a
 
 *566
 
 sampling of obvious changes in individual circumstances that might take place over time.
 

 These factors make it particularly important that courts seek to honor the parties’ expressions of choice, made before disputes erupt, with the parties’ over-all direction always uppermost in the analysis. Knowing that advance agreements will be enforced underscores the seriousness and integrity of the consent process. Advance agreements as to disposition would have little purpose if they were enforceable only in the event the parties continued to agree. To the extent possible, it should be the progenitors — not the State and not the courts— who by their prior directive make this deeply personal life choice.
 

 Here, the parties prior to cryopreservation of the pre-zygotes signed consents indicating their dispositional intent. While these documents were technically provided by the IVF program, neither party disputes that they are an expression of their own intent regarding disposition of their pre-zygotes. Nor do the parties contest the legality of those agreements, or that they were freely and knowingly made. The central issue is whether the consents clearly express the parties’ intent regarding disposition of the pre-zygotes in the present circumstances. Appellant claims the consents are fraught with ambiguity in this respect; respondent urges they plainly mandate transfer to the IVF program.
 

 The subject of this dispute may be novel but the common-law principles governing contract interpretation are not. Whether an agreement is ambiguous is a question of law for the courts (see,
 
 Van Wagner Adv. Corp. v S & M Enters.,
 
 67 NY2d 186, 191). Ambiguity is determined by looking within the four corners of the document, not to outside sources (see,
 
 W.W.W. Assocs. v Giancontieri,
 
 77 NY2d 157, 162-163). And in deciding whether an agreement is ambiguous courts
 

 
 *567
 
 Where the document makes clear the parties’ over-all intention, courts examining isolated provisions “ ‘should then choose that construction which will carry out the plain purpose and object of the [agreement]’ ”
 
 (Williams Press v State of New
 
 York, 37 NY2d 434, 440, quoting
 
 Empire Props. Corp. v Manufacturers Trust Co.,
 
 288 NY 242, 249).
 

 
 *566
 
 “should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought”
 
 (Atwater & Co. v Panama R. R. Co.,
 
 246 NY 519, 524).
 

 
 *567
 
 Applying those principles, we agree that the informed consents signed by the parties unequivocally manifest their mutual intention that in the present circumstances the prezygotes be donated for research to the IVF program.
 

 The conclusion that emerges most strikingly from reviewing these consents as a whole is that appellant and respondent intended that disposition of the pre-zygotes was to be their joint decision. The consents manifest that what they above all did not want was a stranger taking that decision out of their hands. Even in unforeseen circumstances, even if they were unavailable, even if they were dead, the consents jointly specified the disposition that would be made. That sentiment explicitly appears again and again throughout the lengthy documents. Words of shared understanding — “we,” “us” and “our” — permeate the pages. The overriding choice of these parties could not be plainer: “We
 
 have the principal responsibility to decide the disposition of our frozen pre-zygotes. Our frozen pre-zygotes will not be released from storage for any purpose without the written consent of both of us, consistent with the policies of the IVF Program and applicable
 
 law” (emphasis added).
 

 That pervasive sentiment — both parties assuming “principal responsibility to decide the disposition of [their] frozen prezygotes” — is carried forward in addendum no. 2-1:
 

 “In the event that we * * * are unable to make a decision regarding disposition of our stored, frozen pre-zygotes, we now indicate our desire for the disposition of our pre-zygotes and direct the IVF Program to * * *
 

 “Our frozen pre-zygotes may be examined by the IVF Program for biological studies and be disposed of by the IVF Program for approved research investigation as determined by the IVF Program.”
 

 Thus, only by joint decision of the parties would the pre-zygotes be used for implantation. And otherwise, by mutual consent they would be donated to the IVF program for research purposes.
 

 
 *568
 
 The Appellate Division plurality identified, and correctly resolved, two claimed ambiguities in the consents. The first is the following sentence in informed consent no. 2: “In the event of divorce, we understand that legal ownership of any stored pre-zygotes must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction.” Appellant would instead read that sentence: “In the event of divorce, we understand that legal ownership of any stored pre-zygotes must be determined by a court of competent jurisdiction.” That is not, however, what the sentence says. Appellant’s construction ignores the direction that ownership of the pre-zygotes “must be determined in a property settlement” — words that also must be given meaning, words that connote the parties’ anticipated agreement as to disposition. Indeed, appellant and respondent did actually reach a settlement stipulation, reserving only the issue of the pre-zygotes (the subject of their earlier consents).
 

 Additionally, while extrinsic evidence cannot
 
 create
 
 an ambiguity in an agreement, the plurality properly looked to the “uncontested divorce” instrument, signed only weeks after the consents, to
 
 resolve
 
 any ambiguity in the cited sentence. Although that instrument never became operative, it reaffirmed the earlier understanding that neither party would alone lay claim to possession of the pre-zygotes.
 
 [5]
 

 Apart from construing the sentence in isolation, the plurality also read it in the context of the consents as a whole. Viewed in that light, we too conclude that the isolated sentence was not dispositional at all but rather was “clearly designed to insulate the hospital and the IVF program from liability in the event of a legal dispute over the pre-zygotes arising in the context of a divorce” (235 AD2d at 160). To construe the sentence as appellant suggests — surrendering all control over the pre-zygotes to the courts — is directly at odds with the intent of the parties plainly manifested throughout the consents that disposition be only by joint agreement.
 

 For much the same reason, we agree with the plurality’s conclusion that addendum no. 2-1 — the “statement of disposition” — was not strictly limited to instances of “death or other
 
 *569
 
 unforseen circumstances.” Those are contingencies that would be resolved by the addendum, but they are not the only ones. We reach this conclusion, again, from reviewing the provisions in isolation and then in the context of the consents as a whole. While we agree that the words “death or any other unforeseen circumstances” in informed consent no. 2 did not create a condition precedent (235 AD2d at 159), we also note that the present circumstances — including the parties’ inability to reach the anticipated settlement — might well be seen as an “unforeseen” circumstance. Moreover, viewing the addendum in isolation, there is no hint of the claimed condition in the document itself. The document is a free-standing form, separately captioned and separately signed by the parties. Finally, viewing the issue in the context of the consents as a whole, as the plurality noted, “the overly narrow interpretation advocated by [appellant] is refuted not only by the broad language of the dispositional provision itself, but by other provisions of the informed consent document as well” (235 AD2d at 159).
 

 As they embarked on the IVF program, appellant and respondent — “husband” and “wife,” signing as such — clearly contemplated the fulfillment of a life dream of having a child during their marriage. The consents they signed provided for other contingencies, most especially that in the present circumstances the pre-zygotes would be donated to the IVF program for approved research purposes. These parties having clearly manifested their intention, the law will honor it.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Judges Titone, Bellacosa, Smith, Levine, Ciparick and Wesley concur.
 

 Order affirmed, with costs.
 

 [1]
 

 . We use the parties’ term “pre-zygotes,” which are defined in the record as “eggs which have been penetrated by sperm but have not yet joined genetic material.”
 

 [2]
 

 . Recently, the New York State Task Force on Life and the Law issued a comprehensive report,
 
 Assisted Reproductive Technologies,
 
 together with recommendations for regulation. The report, following two years of study by the full Task Force, addresses a wide range of relevant subjects, such as the commercial aspects of what has become a sizable business, and impacts on children bom of assisted reproductive technologies
 
 (see also,
 
 1997-1998 NY Senate Bill S 5815 [Nov. 24, 1997] [requiring that couples specify in writing how embryos are to be disposed of before a facility can accept them for storage]).
 

 [3]
 

 . Within recent months, for example, the press has carried news of a divorcing New Jersey couple now litigating the disposition of frozen embryos, with the
 
 husband
 
 wanting them for implantation in a future spouse and the wife objecting
 
 (see,
 
 Booth,
 
 Fate of Frozen Embryos Brings N.J. Again to Bioethics Fore: With No Precedent, Court to Decide on Request to Destroy Fertilized Ova,
 
 NJLJ, Mar. 9, 1998, at 1, col 2). And a now-divorced California couple is litigating the issue of support of a child conceived during their marriage through a donor egg, donor sperm and surrogate mother
 
 (see, In re Marriage of Buzzanca,
 
 61 Cal App 4th 1410, 72 Cal Rptr 2d 280 [Ct App 4th Dist];
 
 see also,
 
 Hernandez and Maharaj,
 
 O.C. Couple Who Used Surrogate Ruled Parents; Custody: In Closely Watched Case, Appeals Court Declares That Intent Is More Important Than Biological Ties,
 
 L.A. Times, Mar. 11, 1998, at A1).
 

 [4]
 

 . Parties’ agreements may, of course, be unenforceable as violative of public policy (see,
 
 e.g.,
 
 Domestic Relations Law § 121
 
 et seq.
 
 [declaring surrogate parenting contracts contrary to policy, void and unenforceable]; Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 122, 1998 Pocket Part, at 255 [“commercial surrogacy arrangements involve a form of procreation for profit, if not prostitution”]). Significantly changed circumstances also may preclude contract enforcement. Here, however, appellant does not urge that the consents violate public policy, or that they are legally unenforceable by reason of significantly changed circumstances.
 

 [5]
 

 . As noted by the Appellate Division, unless public policy is violated, parties to a litigation are free to chart their own procedural course — as they did here. On January 9, 1995, both sides agreed that the matter should be determined on the submissions, and one week later plaintiffs attorney indicated that the last affidavit had been submitted. “The record upon which we must rule was thereby established” (235 AD2d at 162).