*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SARAH MARIE MARKIEWICZ,

      Plaintiff-Appellant,

v

DAVID RANDAL MARKIEWICZ,

      Defendant-Appellee.

UNPUBLISHED
March 24, 2022

No. 355774
Macomb Circuit Court
Family Division
LC No. 2019-003236-DM

Before: GADOLA, P.J., and BORRELLO and M. J. KELLY, JJ.

PER CURIAM.

This appeal involves the disposition of a cryogenically-preserved embryo. As part of divorce proceedings between defendant, David Markiewicz, and plaintiff, Sarah Markiewicz, the trial court awarded the embryo to David. Sarah now appeals as of right. For the reasons stated in this opinion, we reverse and remand for further proceedings.

## I. BASIC FACTS

David and Sarah married in 2009. During their marriage, they both financially contributed to the creation of a number of embryos using *in vitro* fertilization (IVF) techniques. The eggs used in the process were from Sarah's sister and the sperm was from David. Using some of the embryos, Sarah gave birth to four children during the marriage.[1] In 2019, Sarah filed for divorce. The parties were able to resolve all issues, save for the disposition of one remaining embryo, which had been cryogenically preserved.

---

[1] When the judgment of divorce was finalized, the oldest child was eight years old, the next child was seven years old, and a pair of twins were four years old.

-1-

On September 30, 2020, the parties addressed the issue of the frozen embryo at a hearing. Sarah's lawyer represented that Sarah wanted to keep the embryo, noting that it was probably Sarah's "last chance to have children if she so chooses." Sarah's lawyer offered to include language in the judgment of divorce stating that David would not be responsible—financially or otherwise—if Sarah had a child from the embryo. The lawyer clarified that if David did not want to be the child's father, "we can very easily do that through a judgment." In response, David's lawyer stated:

> [David] does not want another child. These are [sic] parties are in their 40s, they have four children. He does not want another child born from these embryos that were already—that's how they have their first four children. And to make him responsible for or to have another child that he doesn't choose to have is absolutely, according to the research I've done it's inappropriate and she can't, she can't basically plant [sic] an embryo that he doesn't agree that's going to be planted [sic] when it's his sperm.

David's lawyer added:

> [It would be] ridiculous for a child to be out there with my client's sperm and you're going to tell him that he's not financially responsible when there's another child running around that's his. No, he does not want this child to be born, for a child to be born. They have four children. She's in her 40s. To make another child at that time I just don't even understand where the argument is coming from. . . . It's not her egg.

The court asked whether the frozen embryo was marital property. Sarah's lawyer stated, unequivocally, "it is marital property." David's lawyer was less certain, stating: "I don't know," and then clarifying that because it was created with David's sperm, but not Sarah's egg, it was "more his than hers." The trial court held that it was marital property because both David and Sarah had contributed financially to its creation.

The trial court then determined that it would award the frozen embryo to David, reasoning:

> I have three, I wanted more, a couple did not go to term, it was all I could ask of from my wife and we retired. I'm the youngest of seven. I didn't want to kill her, you know. Three is a good effort. Five pregnancies and three is a good effort.
>
> You've had four. We're divorcing. She's not pregnant. There's a—it's not science fiction but there's an embryo sitting there that cannot live on its own. It's, it's frozen; it's not triggered into anything. It's easy to say, Hey, we'll write whatever language, you know, you have no financial responsibility. Well, I guess some people wouldn't care. I hear from a lot of them each day, they don't care. If my number's zero, I'll never see her again. That's not everybody and I wouldn't want that knowledge myself around. I'd feel horrible about myself. First, I would be angry that I had no say in it, it was ordered that it go forward completely on the other person's decision, and then I'd feel awful about myself and who knows what would be said about me going forward. And then I would give some legalistic

explanation, Well, no.  It was in the Judgment that I didn't have to.  No, you're still a horrible person.  So I don't think it's fair to the plaintiff on this set of facts.  So, I guess I will award that marital property to [Sarah], I'm sorry, to [David].

Thereafter, the court entered a written order awarding the frozen embryo to David.[2]

On November 20, 2020, Sarah moved for reconsideration, contending that she had been unable to brief whether the embryo should be treated as property.  She represented that, as a result of legal research and consultation with experts in the medical field, she believed that the embryo should not be considered property.  She sought permission to brief the issue.  The court denied her motion.  This appeal follows.[3]

## II.  DUE PROCESS

Sarah argues that she was denied her constitutional right to due process because the trial court did not permit her to present evidence or make an argument regarding the legal status of the embryo.  We disagree.  Procedural due process requires "notice of the nature of the proceedings, an opportunity to be heard in a meaningful time and manner, and an impartial decisionmaker." *Cummings v Wayne Co*, 210 Mich App 249, 253; 533 NW2d 13 (1995).  Sarah only argues that she was denied an opportunity to be heard in a meaningful manner.  At the hearing on September 30, 2020, Sarah's lawyer stated that the disposition of the embryo was a contested issue.  The court then permitted Sarah, through her lawyer, to argue why the embryo should be awarded to Sarah.  The trial court did not limit the argument and asked questions where clarification was necessary.  Further, although Sarah contends that she was denied an opportunity to present testimony or evidence, she has not directed us to any statements by the trial court that actually prevented her from presenting testimony or evidence at the hearing.[4]

---

[2] On appeal, Sarah argues that the trial court's order lacked clarity because the court first stated that it was awarding the embryo to Sarah and then that it was awarding it to David.  However, viewed in context, it is clear that the court misspoke when it stated that it was awarding the embryo to Sarah.  Moreover, the court's written order unambiguously awarded the embryo to David, not Sarah.  See *In re Contempt of Henry*, 282 Mich App 656, 678; 765 NW2d 44 (2009) ("[A] court speaks through its written orders and judgments, not through its oral pronouncements.").  Accordingly, Sarah's argument is wholly without merit.

[3] In December 2020, the facility where the embryo is being stored notified the parties that, as a result of the legal dispute regarding the ownership of the embryo, it would "remain frozen," and "no action to destroy the embryo" would be taken "until this matter is adjudicated by the courts."

[4] In her motion for reconsideration, Sarah asserted, for the first time, that she believed the embryo should not be classified as "property," and she requested permission to brief that issue.  However, issues raised for the first time on a motion for reconsideration are not preserved for appellate review. *Dep't of Environmental Quality v Morley*, 314 Mich App 306, 316; 885 NW2d 892 (2015).

## III. RELIGIOUS FREEDOM AND THIRD-PARTY RIGHTS

Sarah argues that the trial court impeded her religious freedom by awarding the embryo to David. She also argues that the trial court order did not account for any rights her sister may have related to the embryo. Neither issue was raised in the proceedings before the trial court. "Failure to timely raise an issue waives review of that issue on appeal." *Baxter v Geurink*, 493 Mich 924 (2013), citing *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008). Because a waived error is extinguished, there are no errors for this Court to review.

## IV. CLASSIFICATION OF A FROZEN EMBRYO DURING DIVORCE

Sarah argues for the first time on appeal that she believes a frozen embryo is a human life, not simply marital property. However, in the proceedings before the trial court, Sarah stated unequivocally that the embryo was marital property, and the trial court agreed. As a result, she is judicially estopped from challenging the determination that the frozen embryo is marital property.

> "Judicial estoppel precludes a party from adopting a legal position in conflict with a position taken earlier in the same or related litigation. The doctrine protects the integrity of the judicial and administrative processes." *Ford Motor Co v Pub Serv Comm*, 221 Mich App 370, 382-383; 562 NW2d 224 (1997). This Court has held that "[u]nder the doctrine of judicial estoppel, a party that has unequivocally and successfully set forth a position in a prior proceeding is estopped from setting forth an inconsistent position in a later proceeding." *Detroit Int'l Bridge Co v Commodities Export Co*, 279 Mich App 662, 672; 760 NW2d 565 (2008). For the doctrine to apply, the party's position in the prior proceeding must have been " 'wholly inconsistent' " with the same party's position in the later proceeding. *Szyszlo v Akowitz*, 296 Mich App 40, 51; 818 NW2d 424 (2012), quoting *Paschke v Retool Indus*, 445 Mich 502, 510; 519 NW2d 441 (1994). The doctrine was developed to prevent parties from playing " 'fast and loose' with the legal system." *Paschke*, 445 Mich at 509 (citation omitted). [*Wells Fargo Bank, NA v Null*, 304 Mich App 508, 537; 847 NW2d 657 (2014).]

Here, because Sarah unequivocally and successfully argued that the embryo was marital property, she is precluded from advancing an inconsistent argument now.[5] Because Sarah is judicially estopped from challenging the classification of a frozen embryo as property, we do not—and cannot—address whether, under Michigan law, frozen embryos constitute property subject to equitable distribution.

---

[5] Sarah argues, briefly, that the trial court erred in awarding the property to David because it did not properly consider her contribution to the creation of the embryo. The record belies that claim. The trial court expressly inquired as to Sarah's contribution to the creation of the embryo, and, on the basis of her contribution, determined that the embryo was marital, not separate property.

## V.  DISPOSITION OF A FROZEN EMBRYO DURING DIVORCE

### A.  STANDARD OF REVIEW

Sarah next argues that, even if a frozen embryo is considered property, the trial court erred by awarding it to David.[6]  In a divorce case, we review the trial court's factual findings for clear error.  *Sparks v Sparks*, 440 Mich 141, 151; 485 NW2d 893 (1992).  "If the findings of fact are upheld, the appellate court must decide whether the dispositive ruling was fair and equitable in light of those facts."  *Id*. at 151-152.  That dispositional ruling is to be affirmed unless this Court is left with a firm conviction that the property division was inequitable.  *Id*. at 152.

### B.  ANALYSIS

"The goal behind dividing marital property is to reach an equitable distribution in light of all the circumstances."  *Washington v Washington*, 283 Mich App 667, 673; 770 NW2d 908 (2009).  Therefore, "[a]lthough marital property need not be divided equally, it must be divided equitably in light of a court's evaluation of the parties' contributions, faults and needs."  *Richards v Richards*, 310 Mich App 683, 694; 874 NW2d 704 (2015).  In *Sparks*, 440 Mich at 159-160, our Supreme Court provided the following list of factors "to be considered wherever they are relevant to the circumstances of the particular case:"

> (1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8) past relations and conduct of the parties, and (9) general principles of equity.

This list is not exhaustive.  *Id*. at 160.  "There may be additional factors that are relevant to a particular case."  *Id*.  Consequently, "[t]he determination of relevant factors will vary depending on the facts and circumstances of the case."  *Id*.[7]

---

[6] While we agree with the partial dissent that "the award of a frozen embryo in a divorce or other proceeding is an extremely important issue worthy of scholarly examination and debate" and that we are precluded from addressing or determining the status of the frozen embryo as anything other than property, we do not agree that we are constrained from discussing the special nature of the frozen embryo as property, nor do we believe that, in doing so, we are producing orbiter dictum.  To be sure, Sarah's argument on appeal is that, if the frozen embryo is property, then the court abused its discretion because it did not properly consider the *Sparks* factors, including the additional fact concerning the special nature of the embryo.  This is not an argument that she is judicially estopped from making, and, therefore, it is not improper for us to consider it on appeal.  Indeed, we are obligated to do so.

[7] Sarah argues that the court made no findings related to the *Sparks* factors.  She then asserts that the court made findings related to two of the factors, but erred by not making findings related to each factor.  She has not, however, offered any analysis as to why the factors not addressed by the court were relevant to the disposition of the embryo in this case.  "It is not enough for an appellant

-5-

Sarah contends that an additional factor the court should have considered was the unique nature of a frozen human embryo. Although there are no cases in Michigan directly addressing the nature of a frozen embryo, our legislature has indicated a public policy that includes special protections for nonviable embryos. We reach this conclusion based on the legislature's enactment of the fetal protection act in 1998. See MCL 750.90a *et seq.* As explained in *People v Kurr*, 253 Mich App 317, 321-322; 654 NW2d 651 (2002):

> [The fetal protection action] punishes individuals who harm or kill fetuses or embryos under various circumstances. MCL 750.90a and 750.90b set forth penalties for harming a fetus or embryo during an intentional assault against a pregnant woman. MCL 750.90a punishes an individual for causing a miscarriage or stillbirth with malicious intent toward the fetus or embryo or for causing a miscarriage or stillbirth while acting "in wanton or willful disregard of the likelihood that the natural tendency of [his or her] conduct is to cause a miscarriage or stillbirth or great bodily harm to the embryo or fetus." MCL 750.90b punishes an individual for harming or killing a fetus or embryo during an intentional assault against a pregnant woman without regard to the individual's intent or recklessness concerning the fetus or embryo. MCL 750.90c punishes an individual for harming or killing a fetus or embryo during a grossly negligent act against a pregnant woman, again without regard to the individual's state of mind concerning the fetus or embryo.

> The plain language of these provisions shows the Legislature's conclusion that fetuses are worthy of protection as living entities as a matter of public policy. See, generally, *People v Matelic*, 249 Mich App 1, 10, 641 NW2d 252 (2001) (the main indication of legislative intent is the plain language of the statute). Indeed, we note that a violation of MCL 750.90a is punishable by up to life imprisonment, nearly the harshest punishment available in our state. Moreover, in enacting the fetal protection act, the Legislature did not distinguish between fetuses that are viable, or capable of surviving outside the womb, and those that are nonviable. In fact, the Legislature used the term "embryo" as well as the term "fetus" in describing the prohibited conduct, and Black's Law Dictionary (7th ed, 1999), p. 540, defines "embryo" as "[a] developing but unborn or unhatched animal; esp., an unborn human from conception until the development of organs (i.e., until about

---

in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Accordingly, Sarah has abandoned this argument on appeal and we will not address it further. Nonetheless, remand is necessary in this case. As a result, although we do not address Sarah's argument, nothing in our opinion should be read to preclude her from presenting evidence and arguing on remand that specific *Sparks* factors are relevant and should be weighed in favor of awarding the embryo to her.

the eighth week of pregnancy)." This definition clearly encompasses nonviable fetuses. . . .

Additionally, civil protection exists for embryos. Specifically, MCL 600.2922a, provides that "[a] person who commits a wrongful or negligent act against a pregnant individual is liable for damages if the act results in a miscarriage or stillbirth by that individual, or physical injury to or the death of the embryo or fetus." Although the criminal statutes do not extend to embryos that "exist outside a woman's body, i.e., frozen embryos," see *Kurr*, 253 Mich App at 323, and although MCL 600.2922a expressly requires that the wrongful act be committed against a "pregnant individual," we conclude that as a matter of public policy, through the enactment of those statutes, the legislature has expressed that an embryo is something more than just human tissue.

Indeed, other jurisdictions that have grappled with the issue have concluded that, because of its unique potential for human life, a frozen embryo is entitled to special respect.[8] In *Davis v Davis*, 842 SW2d 588, 596 (Tenn, 1992), the Supreme Court of Tennessee referenced the ethical standards set forth by The American Fertility Society, noting:

> Three major ethical positions have been articulated in the debate over preembryo status. At one extreme is the view of the preembryo as a human subject after fertilization, which requires that it be accorded the rights of a person. This position entails an obligation to provide an opportunity for implantation to occur and tends to ban any action before transfer that might harm the preembryo or that is not immediately therapeutic, such as freezing and some preembryo research.

> At the opposite extreme is the view that the preembryo has a status no different from any other human tissue. With the consent of those who have decision-making authority over the preembryo, no limits should be imposed on actions taken with preembryos.

> A third view—one that is most widely held—takes an intermediate position between the other two. It holds that the preembryo deserves respect greater than that accorded to human tissue but not the respect accorded to actual persons. [citation omitted.]

---

[8] See Samuel B Casey & Nathan A Adams, IV, *Specially Respecting the Living Human Embryo by Adhering to Standard Human Subject Experimentation Rules*, 2 Yale J. Health Pol'y, L. & Ethics 111 (2001), noting that in the debate over what legal status should be accorded to a human embryo:

> The undisputed, scientifically verifiable facts agreed to by even the most liberal proponents of human embryonic stem cell research are that (1) the embryo is living and genetically unique; (2) the embryo is human and capable of developing into an adult; and (3) derivation of human stem cells from embryos terminates them. [footnotes omitted.]

Having considered the three ethical positions related to the status of a "pre-embryo," the *Davis* court concluded "that preembryos are not, strictly speaking, either 'persons' or 'property,' but occupy an interim category that entitles them to special respect because of their potential for human life." *Id*. at 597.  See also *McQueen v Gadberry*, 507 SW3d 127, 149 (Mo App, 2016) (holding that frozen pre-embryos are "entitled to special respect" because even though they "may never realize their biologic potential, even if implanted, they are unlike traditional forms of property or external things because they are comprised of a woman and man's genetic material, are human tissue, and have the potential to become born children."); and *Jocelyn P v Joshua P*, 250 Md App 435, 446; 250 A3d 373 (2021) (recognizing "the special respect due cryopreserved pre-embryos in light of their potential for human life as well as the fundamental and coextensive rights of their progenitors to decide whether to bear or beget a child.") (quotation marks and citation omitted). Like the courts in *Davis*, *McQueen*, and *Jocelyn P*, we agree that a frozen embryo deserves special respect because of its unique potential for human life.  As a result, any disposition of a frozen embryo must start with the recognition that, even when a frozen embryo is treated as property, it nevertheless may one day develop into a born child.

Keeping in mind the special respect due to a frozen embryo, we must determine a legal framework to allow for the equitable distribution of a frozen embryo, when, as in this case, it is being treated as property.  Generally, other states have recognized three approaches to determine the disposition of a frozen embryo in a divorce: the contemporaneous mutual consent approach, the contractual approach, and the balancing approach.  The approaches were explained by the Virginia Court of Appeals in *Jessee v Jessee*, 74 Va App 40, 52-53; 866 SE2d 46 (2021):

> Under the contemporaneous mutual consent approach, the pre-embryos must remain in storage until the parties agree to a disposition.  *Bilbao v Goodwin*, 217 A3d 977, 985 (Conn, 2019); *In re Marriage of Witten*, 672 NW2d 768, 777-78 (Iowa 2003).  If they cannot agree, then the status quo is maintained, and "the pre-embryos remain in storage indefinitely." *Bilbao*, 217 A.3d at 985.  The contractual approach provides that a pre-existing agreement between the parties regarding the disposition of preserved pre-embryos is "presumed valid and enforceable."  See, e.g., *id*. at 984, 992 (determining that the parties had an enforceable agreement); *Kass v Kass*, 91 NY2d 554; 673 NYS2d 350; 696 NE2d 174, 179 (1998) (holding that the parties' agreement controlled).  The balancing approach requires a circuit court to weigh the parties' respective interests in the pre-embryos. *Bilbao*, 217 A3d at 985.

> The exceedingly rare mutual consent approach is disfavored. See, e.g., *Jocelyn P v Joshua P*, 250 Md App 435; 250 A3d 373, 405 (2021); *In re Marriage of Rooks*, 429 P3d 579, 592 (Colo, 2018); *Reber v Reiss*, 42 A3d 1131, 1136 (Pa Super Ct 2012).  But see *Witten*, 672 NW2d at 783 (using this approach); cf. *McQueen*, 507 SW3d at 145-47 (affirming award of joint ownership to both of the spouses using the balancing approach).  Most jurisdictions that have considered the approach have held it to be impractical and unworkable.  See, e.g., *Jocelyn P*, 250 A3d at 405; *Rooks*, 429 P3d at 592; *Reber*, 42 A.3d at 1136.  As the Colorado Supreme Court persuasively explained, "[i]t is . . . unrealistic to think that parties who cannot reach agreement on a topic so emotionally charged will somehow reach resolution after a divorce is finalized." *Rooks*, 429 P3d at 592.

In contrast, the contractual approach, which recognizes the validity of a contract between the parties as governing the disposition of preserved pre-embryos, is embraced by the majority of jurisdictions that have addressed the issue. See *Jocelyn P*, 250 A3d at 381; *Bilbao*, 217 A3d at 986, 992; *Szafranski v Dunston*, 393 Ill Dec 604; 34 NE3d 1132, 1147 (Ill App Ct 2015); *In re Marriage of Dahl & Angle*, 222 Or App 572; 194 P3d 834, 840 (2008); *Roman v Roman*, 193 SW3d 40, 48 (Tex App, 2006); *Kass*, 673 NYS2d 350; 696 NE2d at 180; *Davis v Davis*, 842 SW2d 588, 598 (Tenn, 1992), petition to rehear granted in part, No. 34, 1992 WL 341632 (Tenn, 1992) (per curiam). But see *Witten*, 672 NW2d at 781 (rejecting this approach); *AZ v BZ*, 431 Mass 150; 725 NE2d 1051, 1057 (2000) (noting that it would not uphold an agreement between the parties if it "would compel one donor to become a parent against his or her will").

In the absence of such an agreement through contract, courts commonly use the third approach, which balances the parties' competing interests. See, e.g., *Jocelyn P*, 250 A3d at 380; *Rooks*, 429 P3d at 593-94; *Davis*, 842 SW2d at 603-04.

We agree with the courts in other jurisdictions that have rejected as impractical the contemporaneous mutual consent approach. See *Rooks*, 429 P3d at 592; *Reber*, 42 A3d 1135 n 5; *Jessee*, 74 Va App at 54; *Jocelyn P*, 250 Md App at 447. Forcing the parties to "decide later is making no decision at all." *Jessee*, 74 Va App at 54 (quotation marks and citation omitted). Indeed, as recognized by the court in *Rooks*, the mutual contemporaneous consent approach "gives one party a de facto veto over the other party by avoiding any resolution until the issue is eventually mooted by the passage of time." *Rooks*, 429 P3d at 589. Because this approach is inherently impractical, we reject it.

Instead, like the Maryland Special Court of Appeals in *Jocelyn P*, we hold that disputes that arise during a divorce regarding the disposition of a frozen embryo should be decided using a blend of the contractual approach and the balancing approach. See *Jocelyn P*, 250 Md App at 486. This blended approach requires courts to first look to see if there is a valid agreement between the parties addressing the disposition of the embryo. In the absence of such an agreement, the court must then "balance the interests of the parties to determine disposition of the frozen pre-embryos." *Id*. at 479.

Balancing the parties interests will require the consideration of many factors. The court should consider the original reasons that the parties underwent IVF treatment. Consideration of this factor should account for the parties' beliefs as they relate to the creation of an embryo. For instance, in *Jocelyn P*, the court noted that Jocelyn P had testified that she and Joshua P had "agreed that every single embryo would be used because we create a life and it was our responsibility to give that embryo the opportunity for life." *Id*. at 496. The court directed that Jocelyn's testimony, if credible, would be a fact pertinent to the original reasons for undergoing IVF. *Jocelyn P*, 250 Md App at 496. A party's stated belief that an embryo is a human being, as opposed to mere

property, is also relevant to this inquiry. See *id*. at 465 (noting that Jocelyn believed, as do others, that 'the embryo is human and capable of developing into an adult.").[9]

The trial court should consider the parties' positions related to the disposition of the embryo. In this case, David seeks to avoid procreation because he already has four children, whereas Sarah would like to preserve her ability to potentially have a child in the future. A court should also consider whether the party seeking procreation would have any other reasonable means of achieving parenthood were the embryos at issue to be destroyed.[10] As it relates to the party seeking to destroy an embryo, it is appropriate to consider the implications of imposing unwanted parenthood on that party, including the possible financial and psychological consequences of doing so. *Davis*, 842 SW2d at 603; see also *McQueen*, 507 SW3d at 146-147 (noting that awarding the embryo to McQueen "would impose unwanted parenthood on Gadberry, with all of its possible life-long emotional, psychological, and financial responsibilities."). "In addition, courts should consider the possibility of a party's bad faith and attempt to use the frozen pre-embryo[s] as leverage in the divorce proceeding." *Jessee*, 74 Va App at 57 (quotation marks and citation omitted).

In light of our decision to adopt a blend between the contractual approach and the balancing approach, it is necessary to reverse and remand for further proceedings because the trial court did not have the benefit of this legal framework when it initially made its decision to award the embryo to David. On remand, the trial court shall consider the applicable *Sparks* factors. With regard to the additional relevant factor identified in this opinion, i.e., the special nature of the embryo, the trial court should first consider whether the disposition of the embryo is governed by a valid contract between the parties. If such a contract exists, the matter should be concluded in accord with the contractual terms that the parties agreed upon in that contract. If there is no contract, then

---

[9] In contrast, in *McQueen*, the original reason the parties sought IVF treatment was because of geographical distance as opposed to fertility concerns. *McQueen*, 507 SW3d at 145. Specifically, the record reflected that McQueen had two children using IVF with Gadberry before she had a third child with traditional methods with another man. *Id*. Although she wanted to have another child with Gadberry, he did not want another child with her because they had extensive problems co-parenting their existing children. *Id*. Because IVF was not used for fertility purposes, this factor weighed against awarding the embryos to McQueen for purposes of having a child or children with Gadberry.

[10] The facts of each case will dictate whether there is a reasonable alternative available. For instance, adoption is not a reasonable alternative for an individual interested in becoming a genetic parent. *Jessee*, 74 Va App at 58 n 14. Additionally, in *Jocelyn P*, Jocelyn P argued that her only means of achieving genetic parenthood was using IVF. *Jocelyn P*, 250 Md App at 494. Joshua P preferred that it either be destroyed or donated to another couple with both parents giving up their parental rights. *Id*. at 495. Although Jocelyn P testified that she was physically capable of repeating the IVF process, the court concluded that the existence of other means to achieve parenthood must be reasonable. *Id*. The court reasoned that requiring the IVF process to be repeated must account for the "physical and emotional toll the IVF process bore on Jocelyn; her age; or the possibility of a successful process." *Id*. at 495.

-10-

the court must balance the interests of the parties using the framework stated in this opinion. In doing so, the trial court may again consider the facts—as argued below—that Sarah has already bore four children with David; that the egg used to produce the embryo was not Sarah's, but her sister's; and that Sarah offered to include language in the judgment of divorce indicating that David would have no financial obligations related to any child born as a result of the embryo being implanted. With regard to the remaining *Sparks* factors, additional factors, such as the ages and health of the parties, may also be relevant and should be addressed. Financial considerations may also be considered. The cost of the IVF process is ascertainable. Therefore, it would be appropriate to consider the costs Sarah would incur were she to obtain another embryo using IVF techniques should the court again decide that it is equitable to award the existing embryo to David. Resolution on remand will require the trial court to reopen the proofs to allow presentation of evidence related to the potential existence of a contract between the parties, and legal argument related to whether such a contract is valid. The court should also, if necessary, take testimony relevant to the balancing factors stated in this opinion.

Reversed and remanded for further proceedings. Sarah may tax costs as the prevailing party. MCR 7.219(A). We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Michael J. Kelly