09-2766-cv
Lockheed Martin Corporation v. Retail Holdings, N.V.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

_____

August Term, 2009

(Argued: April 12, 2010                                        Decided: April 26, 2011 )

Docket No. 09-2766-cv

_____

LOCKHEED MARTIN CORPORATION, On its own behalf and as Plan Sponsor, Plan Administrator
and named fiduciary of the Lockheed Martin Corporation Retirement Income Plan III,

*Plaintiff-Counter-Defendant-Appellee*,

v.

RETAIL HOLDINGS, N.V.,

*Defendant-Counterclaimant-Cross-Claimant-Appellant*,

METROPOLITAN LIFE INSURANCE COMPANY INC., MELLON INVESTOR SERVICES LLC,

*Defendants-Cross-Defendants*.

Before: WINTER, LEVAL, and B.D. PARKER, *Circuit Judges*.[*]

_____

Appeal from a judgment of the United States District Court for the Southern District of
New York (Griesa, *J.*) determining that the contract at issue did not transfer a certain pension
plan from Appellee's predecessor to Appellant's predecessor, and that Appellee is therefore
entitled to the disputed assets associated with the plan.

REVERSED.

_____

[*] One of the original members of the panel recused himself prior to oral argument.  The
Honorable Ralph K. Winter was designated as the third member of the panel. *See* Second Circuit Internal
Operating Procedure E(b) (formerly § 0.14(b) of the Local Rules).

DANIEL HIMMELFARB, Mayer Brown LLP, Washington, D.C. (Robert Allen Meister, Pedowitz & Meister LLP, New York, NY; Robert P. Davis, Brian D. Netter, Mayer Brown LLP, Washington, D.C., *on the brief*), *for Plaintiff-Counter-Defendant-Appellee*.

MARTIN R. GOLD (Michael S. Gugig, Matthew L. Lifflander, Benito Delfin, Jr., *on the brief*), Sonnenschein Nath & Rosenthal LLP, New York, NY, *for Defendant-Counterclaimant-Cross-Claimant-Appellant*.

BARRINGTON D. PARKER, *Circuit Judge*:

Appellant Retail Holdings, N.V. (together with its predecessors, "New Singer") appeals from a judgment of the United States District Court for the Southern District of New York (Griesa, *J.*), entered in favor of Appellee Lockheed Martin Corporation (together with its predecessors, "Old Singer") after a bench trial. The dispute revolves around the interpretation of a 1986 Reorganization and Distribution Agreement (the "Spin-Off Agreement") between Appellee's predecessor, The Singer Company, and Appellant's predecessor, SSMC Inc. At issue is whether the Spin-Off Agreement transferred a particular pension plan, the Executive Office Foreign Service Retirement Plan (the "EOFS Plan" or "Plan"), from Old Singer to New Singer. The Plan is overfunded, and the party with legal rights to it will gain control of approximately $6 million in cash and stock. The district court, relying on extrinsic evidence, concluded that the Spin-Off Agreement did not transfer the EOFS Plan to New Singer, and accordingly ruled that Old Singer is entitled to the disputed assets. Because we conclude that the contract admits of

only one reasonable interpretation, which is that the Plan was transferred to New Singer, we reverse.

**BACKGROUND**

**The EOFS Plan**

The background of this controversy is complicated. As of the 1950s, Old Singer was engaged in the manufacture of Singer sewing machines and furniture. It was an international operation, with thousands of employees and numerous pension plans. In 1957, Old Singer established the EOFS Plan, a pension plan that covered certain Old Singer employees working overseas.[1]

To satisfy its obligations under the Plan, Old Singer purchased Group Annuity Contract No. 365F ("GAC 365F") from the Metropolitan Life Insurance Company ("MetLife"), a nominal defendant. GAC 365F required MetLife to pay pension benefits to EOFS Plan participants once they retired. The Plan was funded by contributions from Old Singer and participating employees. Pursuant to GAC 365F, MetLife deposited these contributions into an account called the Annuity Purchase Payment Reserve (the "APPR"). Significant for purposes of this dispute, Section 11.2 of the EOFS Plan provides that upon termination, any "residual assets" of the Plan not required to be distributed to participants and beneficiaries in accordance with ERISA § 4044(d) would revert to Old Singer.

---

[1] After the passage of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, the EOFS Plan was amended and restated as an ERISA-qualified plan.

In 1972, the EOFS Plan was "frozen"—i.e., closed to new participants—and another plan was initiated to provide retirement benefits to Old Singer's overseas employees. However, existing EOFS Plan participants were permitted to continue participating in the EOFS Plan. Accordingly, the EOFS Plan continued to provide benefits to already-retired participants and, over time, to new retirees who had been covered by the EOFS Plan when it was closed.

**The Spin-Off Agreement**

During the 1970s, Old Singer expanded into new fields, including aerospace technology, and in the 1980s, decided to focus exclusively on its aerospace pursuits and to spin off its sewing and furniture businesses. Old Singer carried out this plan in 1986 by executing the Spin-Off Agreement with New Singer (then a subsidiary of Old Singer known as SSMC Inc.). Pursuant to the Agreement, Old Singer was split into two entities: New Singer, which acquired the sewing and furniture businesses, and Old Singer, which retained the aerospace technology businesses.

Articles II and IV of the contract contain broad asset and liability transfer provisions designed to effectuate the spin-off. The principal such provision, Section 2.01, provides that:

> [Old] Singer has exercised reasonable efforts to cause all of [Old] Singer's right, title and interest in the SSMC Assets and all of its duties, obligations and responsibilities under the SSMC Group Liabilities to be transferred to [New Singer] prior to the Transfer Date [a date on or before July 18, 1986] . . . . Whether or not all of the SSMC Assets or the SSMC Group Liabilities have been legally transferred to [New Singer] prior to the Transfer Date, the parties agree that, as of the Transfer Date, [New Singer] shall have, and shall be deemed to have acquired, complete and sole beneficial ownership over all of the SSMC Assets, together with all of [Old] Singer's rights, powers and privileges incident thereto, and shall be deemed to have assumed . . . all of the SSMC Group Liabilities, and all of [Old] Singer's duties, obligations and responsibilities incident thereto.

4

The Agreement defines "SSMC Assets" as "collectively, all of the assets of the sewing and related products and furniture businesses of [Old] Singer and its subsidiaries and Affiliates, which shall include, without limitation, all rights of [Old] Singer, its Affiliates and subsidiaries under contracts . . . relating to the sewing and/or furniture businesses." "SSMC Group Liabilities" are defined as "collectively, all of the Liabilities of [Old] Singer and its subsidiaries which are assumed by [New Singer] pursuant to Article IV or VIII [of the Agreement]."

Article IV, titled "Assumption of Liabilities," includes Section 4.02, which provides that:

> [I]n addition to any other Liabilities otherwise expressly assumed by [New Singer] . . . pursuant to this Agreement . . . , [New Singer] hereby agrees . . . to assume . . . those Liabilities . . . of all of the operations and businesses included in the Former Singer Businesses [the Old Singer sewing and furniture businesses being transferred to New Singer, as enumerated in Schedule I of the Agreement].

"Liabilities," in turn, are defined as "any and all debts, liabilities and obligations (whether past, present or future, fixed, contingent, or otherwise, known or unknown) including, without limitation, those arising under . . . any contract, commitment or undertaking."

Article VIII of the Spin-Off Agreement addresses, among other things, the disposition of certain of Old Singer's pension plans. Section 8.02, titled "Pension Plans," discusses six pension plans (referred to herein as the "Enumerated Plans") that were to be transferred, in whole or in part, to New Singer. Section 8.02(a) provides that three Furniture Division "Hourly Plans" would be transferred to New Singer in their entirety: "[Old] Singer shall cause the transfer to [New Singer] as of [July 18, 1986] of all of [Old] Singer's rights and interests in [the Hourly

5

Plans]," and "[New Singer] shall assume and be solely responsible for all liabilities and obligations whatsoever of [Old] Singer and its subsidiaries under each of the Hourly Plans." Pursuant to Section 8.02(b), two other plans would be split between Old and New Singer, and the transferred portions would then be merged with another plan being transferred to form a new pension plan to be administered by New Singer. Section 8.02 also provides that certain actions were required to be taken with respect to the Enumerated Plans—for example, Old Singer was obligated to ensure that the Hourly Plans met the Internal Revenue Code's minimum funding standards as of the spin-off, and to deliver certain records relating to the Enumerated Plans to New Singer. The EOFS Plan is not mentioned in Section 8.02.

The next section of the Spin-Off Agreement, Section 8.03, provides that Old Singer would retain liability for future benefit payments to retirees formerly employed in the sewing businesses who were, at the time of the spin-off, already receiving benefits from Old Singer under any pension plan *other than* an Enumerated Plan. Section 8.03 states that:

> With respect to all persons formerly employed by [Old] Singer with respect to the Former Singer Businesses and who are receiving retirement benefits from [Old] Singer as of [July 18, 1986], . . . [Old] Singer shall continue to be solely and exclusively responsible for providing all benefits . . . under . . . (iii) any qualified defined benefit plan maintained by [Old] Singer other than an [Enumerated] Plan.

**The EOFS Plan After the Spin-Off**

Pursuant to the Master Technical and Administrative Services Agreement, an independent agreement between Old Singer and New Singer effective the same day as the Spin-Off Agreement, Old Singer agreed to provide pension and benefits administration services until

6

the end of 1987 for pension plans that had been transferred to New Singer. In 1987, Old Singer's board passed a resolution merging the EOFS Plan into another pension plan, which was, in turn, merged into the Revised Retirement Plan for the United States Employees of the Singer Company (the "U.S. Plan"). After 1987, despite the expiration of its obligations under the Master Technical and Administrative Services Agreement, Old Singer continued to administer the EOFS Plan and its successor plans. This included, for example, filing annual reports with the Department of Labor and maintaining the records of EOFS Plan participants. Old Singer cites this activity as an indication that it continued to own the Plan. New Singer claims that it simply "forgot[]" about the EOFS Plan, and that the Plan "thus remained in Old Singer's hands." Appellant's Br. 53.

Between 1988 and 1996, Old Singer underwent several transformations. In 1988, The Singer Company was acquired by Bicoastal Corporation ("Bicoastal"), which adopted the U.S. Plan. The following year, Bicoastal filed under Chapter 11 of the bankruptcy laws. *In re Bicoastal Corp.*, 125 B.R. 658, 661 (M.D. Fla. 1991). New Singer filed a proof of claim asserting that Bicoastal was liable to it for various breaches of the Spin-Off Agreement. New Singer did not, however, raise any claims in the bankruptcy proceedings regarding the EOFS Plan. During the course of the bankruptcy, Loral Corporation ("Loral") purchased a Bicoastal subsidiary and, as part of that sale, Bicoastal transferred all of the assets and liabilities of the U.S. Plan to a Loral-sponsored retirement plan. *Bicoastal Corp. v. N. Trust Co.*, 146 B.R. 486, 488 (Bankr. M.D. Fla. 1992). In 1996, Appellee Lockheed Martin acquired Loral and adopted that plan, which was subsequently renamed and merged into the Lockheed Martin Corporation

7

Retirement Income Plan III—which Old Singer claims encompasses the EOFS Plan as a result of the transactions recounted above.

In 2000, MetLife notified New Singer that it was discontinuing its business of deposit administration contracts, including GAC 365F, and that the APPR for the EOFS Plan contained reserves of about $3.8 million, which MetLife was prepared to convey to New Singer. However, after Lockheed Martin asserted that it, not New Singer, was the rightful sponsor of the EOFS Plan and owner of GAC 365F, MetLife decided to hold the funds pending resolution of the competing claims.

At around the same time, MetLife demutualized, and as a result of that process, approximately 46,434 shares of MetLife common stock were issued for the owner of GAC 365F. Those shares, which are trading at around $44 per share as of the date of this opinion for a total of roughly $2 million, Nasdaq, http://www.nasdaq.com/aspx/chartingbasics.aspx?symbol= MET&selected=MET (last visited April 25, 2011), are being held by nominal defendant Mellon Investor Services LLC ("Mellon") pending determination of their rightful owner. Neither MetLife nor Mellon has taken any position as to whether New Singer or Old Singer is entitled to the funds and stock in dispute.

**Proceedings Below**

In 2002, Old Singer commenced this action, seeking a declaration that it remained the sponsor of the EOFS Plan after the Spin-Off Agreement, and that it is therefore entitled to the funds in the APPR and the MetLife stock. New Singer counterclaimed, seeking a declaration that because the Agreement transferred to it the EOFS Plan, it is entitled to the disputed assets.

8

In April 2009, the case was tried to the court, which ruled in favor of Old Singer. The court began by "conclud[ing] without any doubt that the EOFS pension plan involved assets and liabilities which were embraced within the language of Section 2.01 and [S]ection 4.02." However, in its view, whether those provisions transferred the EOFS Plan to New Singer was uncertain in light of Section 8.02. The court acknowledged that "Section 8.02 does not state that the specified plans were the only ones to be transferred," but was troubled by the fact that the EOFS Plan was not among them.

Finding ambiguity in the language of the Agreement, the district court turned to extrinsic evidence. First, it found that the parties had presented no evidence of any specific intent regarding the EOFS Plan. The court then looked to evidence of the parties' post-contract conduct, and concluded, based principally on the fact that Old Singer had continued to administer the Plan after the spin-off, that the contract did not transfer the Plan to New Singer. It reached this result despite finding "real force" in New Singer's argument "that there was a basic intent in th[e] [Spin-Off] Agreement to transfer everything that related to the sewing machine and furniture business . . . to [New Singer]," such that it would have been "entirely illogical to leave the EOFS pension plan belonging to [Old] Singer," as all seventy-two of the Plan's participants were current or former employees in the sewing businesses.

Having concluded that the contract did not transfer the EOFS Plan to New Singer, the district court issued a judgment declaring that Old Singer was entitled to the APPR reserves and MetLife stock at issue. New Singer appealed.

**DISCUSSION**

"We review the district court's findings of fact after a bench trial for clear error and its conclusions of law *de novo*." *Green Party of Conn. v. Garfield*, 616 F.3d 213, 224 (2d Cir. 2010) (internal quotation marks omitted). On appeal, both parties argue that the Spin-Off Agreement is unambiguous: New Singer, relying on Sections 2.01 and 4.02, argues that it unambiguously transferred the EOFS Plan; Old Singer, relying on Section 8.02, argues that it unambiguously did not. If the contract is indeed ambiguous, the parties dispute whether the extrinsic evidence of post-contract conduct relied upon by the district court supports its ruling that the Plan remained with Old Singer. Old Singer also argues that New Singer is precluded from even raising a claim to the EOFS Plan, since it did not do so during Bicoastal's bankruptcy proceedings. We conclude that the text of the Spin-Off Agreement unambiguously transferred the EOFS Plan to New Singer. We also conclude that Old Singer's res judicata argument is without merit.

**I.      Interpretation of the Spin-Off Agreement**

**A.      Principles of Contract Interpretation**

It is axiomatic under New York law, which the parties agree applies, that "[t]he fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997). In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous. *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000). "'Ambiguity is determined by looking within the four corners of the document, not to outside sources.'" *JA Apparel Corp. v.*

*Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998)).  When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms.  *South Rd. Assocs., LLC v. IBM*, 826 N.E.2d 806, 809 (N.Y. 2005).  Whether a contract is ambiguous is a question of law, which we review de novo.  *Krumme*, 238 F.3d at 139.

It is well settled that a contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion.  *White v. Cont'l Cas. Co.*, 878 N.E.2d 1019, 1021 (N.Y. 2007).  Conversely, as we have held, the language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.  *Krumme*, 238 F.3d at 138-39.

When determining whether a contract is ambiguous, it is important for the court to read the integrated agreement "as a whole."  *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (internal quotation marks omitted).  If the document as a whole "makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the [agreement]."  *Kass*, 696 N.E.2d at 181 (internal quotation marks omitted; brackets in original).

**B.      Sections 2.01 and 4.02 Unambiguously Transferred the EOFS Plan to New Singer**

We conclude that the EOFS Plan was covered by the language of Sections 2.01 and 4.02 of the Spin-Off Agreement's expansive asset and liability transfer provisions, which transferred

"all" of Old Singer's sewing-related assets and liabilities to New Singer. Old Singer argues that the EOFS Plan cannot have been transferred by those provisions, because it fell outside the scope of the "SSMC Assets" and "Liabilities" to be spun-off. To the contrary, and as the district court correctly found, the language of Sections 2.01 and 4.02 easily embraces Old Singer's rights and obligations under the EOFS Plan.

The Spin-Off Agreement broadly defines "SSMC Assets" as "all of the assets of the sewing and related products and furniture businesses of [Old] Singer." Under the EOFS Plan, any residual Plan surplus in excess of pension liabilities would revert to Old Singer at termination, in accordance with and subject to ERISA § 4044(d). As the district court found, the EOFS Plan pertained to Old Singer's sewing businesses, as it only covered employees who worked or had worked in those businesses. Thus, Old Singer's right under the Plan to any residual surplus falls within the definition of SSMC Assets, "all" of which were transferred to New Singer pursuant to Section 2.01.

Similarly, the obligations owed to Plan participants qualify as "Liabilities," which are broadly defined to include "any and all debts, liabilities and obligations (whether past, present or future, fixed, contingent, or otherwise, known or unknown) including, without limitation, those arising under any . . . contract, commitment or undertaking." Indeed, Article VIII, the portion of the contract that specifically addresses certain pension plans, repeatedly speaks of "liabilities" when discussing the parties' pension-plan obligations. Thus, Old Singer's obligations under the EOFS Plan were covered by Section 4.02, which transferred "all" sewing-related Liabilities to New Singer.

Accordingly, we conclude that the terms "SSMC Assets" and "Liabilities" encompassed Old Singer's rights and obligations under the EOFS Plan, and that Sections 2.01 and 4.02, in turn, transferred all such sewing-related assets and liabilities to New Singer, without limitation. Section 2.01 provides that, regardless of "[w]hether or not all of the SSMC Assets or the SSMC Group Liabilities [which include the "Liabilities" covered by Section 4.02] have been legally transferred to [New Singer] prior to the Transfer Date," New Singer "shall be deemed to have acquired . . . all of the SSMC Assets," and "shall be deemed to have assumed . . . all of the SSMC Group Liabilities," as of that date. We believe that this expansive, catch-all language unambiguously transferred Old Singer's rights and obligations under the EOFS Plan to New Singer.

**C.     Article VIII Does Not Render the Contract Ambiguous**

Old Singer argues that the disposition of pension plans was governed exclusively by Article VIII of the Spin-Off Agreement, which did *not* transfer the EOFS Plan to New Singer, and that, at a minimum, Article VIII renders the contract ambiguous. We disagree. We find nothing in Article VIII that undermines our conclusion that Sections 2.01 and 4.02 transferred the Plan to New Singer.

Old Singer relies on Section 8.02, which enumerates six pension plans that would be fully or partially transferred to New Singer and specifies certain actions that were to be taken with respect to those plans. Old Singer contends that Section 8.02's list of plans is exhaustive, and that because the EOFS Plan is not among them, it was not transferred. But nothing in Section 8.02 indicates that it was intended to be exhaustive. Indeed, the parties easily could have

included language stating that *only* the plans enumerated in Section 8.02 would be transferred. They did not. In stark contrast, Sections 2.01 and 4.02 are, by their terms, unmistakably comprehensive. Those provisions repeatedly use the word "all"—"one of the least ambiguous [words] in the English language," *Geico v. Fetisoff*, 958 F.2d 1137, 1142 (D.C. Cir. 1992)—in making plain the contractual intention to transfer Old Singer's sewing business to New Singer. In the face of the purpose, so clearly expressed in Articles II and IV, to transfer the sewing business, which unquestionably included the EOFS Plan, it would have required something that raised a reasonable indication of an intent to exclude the EOFS Plan to create such an ambiguity. The mere fact that the EOFS Plan is not specifically enumerated in Section 8.02 does not create such an ambiguity in the face of these clear expressions of intention to transfer the business.

In sum, we conclude that Section 8.02 does not render the Spin-Off Agreement ambiguous with respect to the disposition of the EOFS Plan. Nor is Old Singer rescued by Section 8.03, which provides that Old Singer would retain liability for future payments to retired sewing employees who were, as of the spin-off, already receiving pension benefits under any plan "other than an [Enumerated] Plan."[2] Section 8.03 merely provides a specified exception to the transfer of assets and liabilities effected by Articles II and IV, and is entirely consistent with the conclusion that the EOFS Plan was transferred to New Singer. In short, the Plan was transferred to New Singer by the clear and unambiguous terms of Sections 2.01 and 4.02, and Article VIII does nothing to alter that result. Because the contract is unambiguous, it was error

---

[2] For example, this meant that Old Singer would retain liability for payments to EOFS Plan participants who were already retired at the time of the spin-off.

14

for the district court to consider extrinsic evidence of the parties' post-contract conduct. *See Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 100 (2d Cir. 1989) ("[I]n the absence of ambiguity, . . . . any conceptions or understandings any of the parties may have had during the duration of the contract[] is immaterial and inadmissible."). After the spin-off, Old Singer did administer the EOFS Plan, and New Singer may have forgotten about it. But that fact is immaterial because the contract transferred the Plan to New Singer, which, therefore, as the sponsor of the EOFS Plan and the owner of GAC 365F, is entitled to the APPR reserves and MetLife stock in dispute.

**II.  Res Judicata**

Lockheed Martin advances the alternative argument that res judicata precludes New Singer from even raising a claim to the EOFS Plan because it did not assert one during the bankruptcy of Lockheed Martin's predecessor, Bicoastal, in the early 1990s.[3] The district court rejected Lockheed Martin's res judicata argument, concluding that it merely begs the question that the suit seeks to resolve—that is, whether the Spin-Off Agreement transferred control of the EOFS Plan and its assets to New Singer. We agree. Because, as we have concluded, the Spin-Off Agreement transferred the EOFS Plan to New Singer, it hardly needed to file a claim in bankruptcy court to obtain an asset it already owned.

---

[3] New Singer asserts that Lockheed Martin waived this argument by failing to plead the affirmative defense of res judicata in its answer. We need not consider whether the defense was waived, as it is readily apparent that it fails on the merits.

**CONCLUSION**

The judgment of the district court is REVERSED and the case is remanded to the district court with instructions to enter judgment for Appellant Retail Holdings.