**SUNBELT RENTALS, INC. and Liberty Mutual Fire Insurance Company, Plaintiffs,**

v.

**CHARTER OAK FIRE INSURANCE COMPANY, and St. Paul Fire and Marine Insurance Company, Defendants.**

**No. 10 Civ. 5217 FM.**

United States District Court, S.D. New York.

March 14, 2012.

Marshall Todd Potashner, Carolyn Anne Klos, Jaffe & Asher LLP, New York, NY, for Plaintiff.

Thomas Alan Martin, James Mitchell Strauss, Putney Twombly Hall & Hirson LLP, New York, NY, for Defendant.

## DECISION AND ORDER

FRANK MAAS, United States Magistrate Judge.

### I. *Introduction*

In August 2008, while washing windows forty feet above ground at the World Financial Center in New York City, Robert and Darin Fabrizio (the "Fabrizios") fell from an 80–foot manlift and died. The manlift had been leased to non-party Shepard Industries, LLC ("Shepard") by plaintiff Sunbelt Rentals, Inc. ("Sunbelt"). After the accident, Sunbelt inquired about Shepard's insurance coverage, contending that Sunbelt should have been named as an additional insured on Shepard's general liability insurance policies in accordance with the terms of Sunbelt's rental agreements. Travelers Insurance responded on behalf of Shepard's general liability carriers, defendants Charter Oak Fire Insurance Company ("Charter Oak") and St. Paul Fire and Marine Insurance Company ("St. Paul"), disclaiming any duty to defend or indemnify Sunbelt in connection with the accident.

In November 2009, the Fabrizios' representatives commenced a wrongful death suit ("Fabrizio Action") against Sunbelt, Shepard, and other defendants in Supreme Court, New York County.[1] Subsequently,

---

1. *Charlene Sasto, as Adm'x of the Estate of Robert A. Fabrizio, Deceased, and Pub. Adm'r of the Cnty. of N.Y., as Temp. Adm'r of the* *Estate of Darin Fabrizio, Deceased v. Battery Park City Auth., et al.,* Index No. 11575/09 (Supreme Court, N.Y. County).

Sunbelt and its insurance carrier, Liberty Mutual Fire Insurance Company ("Liberty Mutual") (together, the "Plaintiffs"), commenced this insurance coverage action arising under the Court's diversity jurisdiction against Charter Oak and St. Paul (together, the "Defendants"). The Plaintiffs seek a declaration that the Defendants must defend and indemnify Sunbelt. The Plaintiffs further seek a declaration that Sunbelt's coverage under both the Defendants' policies applies on a primary basis, i.e., that the Defendants' policy limits must be fully exhausted before Liberty Mutual will have to respond to the Fabrizios claims.[2]

## II. *Facts*

Except as otherwise noted, the following facts are undisputed:

Sunbelt is engaged in the business of renting construction equipment. (ECF No. 11 (Am. Compl.) ¶¶ 2–3; ECF No. 38 (Aff. of James M. Strauss, Esq., dated Aug. 15, 2011 ("Strauss Aff.")), Ex. I ("Cardinale Dep.") at 9–10). In 2007, Liberty Mutual issued a Commercial General Liability ("CGL") policy ("Liberty Mutual Policy") to Sunbelt for the period from September 30, 2007, to September 30, 2008. (ECF No. 42 (Aff. of Marshall T. Potashner, dated Aug. 15, 2011 ("Potashner Aff.")), Ex. 6; ECF No. 32 (Decl. of Michael Ford, dated Aug. 12, 2011 ("Ford Decl.")), ¶ 6). The Liberty Mutual Policy provides coverage in the amount of $2 million but also has a $2 million deductible. (Potashner Aff. Ex. 6 at LM 1579, LM 1617). For this reason, the Plaintiffs characterize the Liberty Mutual Policy as merely a "fronting" policy. (ECF No. 48 ("Pls.' Reply") at 8; Ford Decl. ¶ 10).

Non-party Shepard performs maintenance work on commercial properties.

(Strauss Aff. Ex. D at 40). In 2007, Charter Oak issued to Shepard an insurance policy for the period from August 22, 2007, until August 22, 2008, which included CGL coverage ("Charter Oak Policy"). (*Id.* Ex. K at D0001, D0057). The Charter Oak Policy had a $10 million aggregate limit. (*Id.* at D0057). Shepard also obtained from St. Paul for the same period a $10 million "Specialty Commercial Umbrella Liability Policy" ("St. Paul Policy"). (*Id.* Ex. L at D0183, D0233).

Under the Charter Oak Policy, Sunbelt is considered an additional insured if Shepard "agreed in a written contract, executed prior to loss, to name [Sunbelt] as an additional insured," provided that the loss does not occur as a result of the sole negligence of the additional insured. (*Id.* Ex. K at D0095–96). Under the St. Paul Policy, the term "Insured" includes "any person, organization, trustee or estate to whom [Shepard is] obligated by a written contract or agreement to provide insurance" such as that afforded to Shepard by the St. Paul Policy. (*Id.* Ex. L at D0188).

Shepard rented manlifts from Sunbelt on four occasions, commencing on or about May 14 and December 4, 2007, and May 29 and July 28, 2008. (ECF No. 31 (Decl. of Joseph Cardinale, dated Aug. 12, 2011 ("Cardinale Decl.")), ¶ 16; *see* Potashner Aff. Exs. 1–4). The accident giving rise to the Fabrizio Action arose out of Shepard's July 2008 rental of an 80–foot articulating manlift. (Cardinale Decl. ¶¶ 17, 31, 33; *see* Strauss Aff. Ex. G at LM 22). On August 5, 2008, the Fabrizios, working as Shepard subcontractors, were using that manlift to wash windows at the World Financial Center in lower Manhattan. As they were suspended forty feet above the ground, the lift either was overthrown or

---

**2.** After their motions were filed, the parties consented to my exercise of jurisdiction pursuant to 28 U.S.C. 636(c). (ECF No. 26).

tipped, causing them to sustain fatal injuries. (*See* Strauss Aff. Ex. C).

According to Sunbelt's sales representative, Joseph Cardinale ("Cardinale"), the Sunbelt rentals to Shepard each were memorialized through at least three documents. (Cardinale Dep. at 12, 28–32; Cardinale Decl. ¶¶ 4–10). First, when Shepard initiated a rental by placing a telephone call to Sunbelt, Sunbelt generated a "Reservation" form that scheduled the necessary type of equipment for a designated location and time. (Cardinale Decl. ¶ 5; Cardinale Dep. at 24–25, 28–29). The Reservation also contained pricing information. (Cardinale Decl. ¶ 5). Later, when the equipment was being delivered, Sunbelt created a "Rental–Out" document, which consisted of two double-sided pages. The front of each page of the Rental–Out identified the particular equipment being delivered to fulfill the reservation; the back of each page set forth "Additional Terms and Conditions" governing the rental. (*Id.* ¶¶ 6, 12; Cardinale Dep. at 30–31; ECF No. 36 (Pls.' 56.1 Statement) ¶¶ 11–12). Finally, when the equipment was returned, Sunbelt would prepare an invoice. (Cardinale Dep. at 32).[3]

Each of the four Rental–Outs prepared in connection with the Shepard rentals contain the same boilerplate "Additional Terms and Conditions." (*See* Potashner Aff. Exs. 1–4). Insofar as relevant, those terms and conditions required Shepard to maintain general liability coverage of "not less than $1,000,000 per occurrence," which "policies shall be primary" and include Sunbelt as an additional insured. (E.g., *id.* Ex. 3 at LM 1692 ¶ 9). The terms and conditions also recited that "[a]ll of the terms" set forth therein would be "*incorporated into all future contracts* between Sunbelt and [Shepard] upon [Shepard's] use of Sunbelt's equipment, without objection, unless subsequently modified in writing by Sunbelt." (*Id.* ¶ 1) (emphasis added).

Sunbelt instructed the drivers delivering the manlifts to the Shepard worksite to bring two copies of the Rental–Out with them. (Cardinale Dep. at 35, 37, 49–50). Sunbelt further directed its drivers to present one copy of the Rental–Out for signature at the point of delivery "if a representative of Shepard was available." (*Id.* at 49–50; Cardinale Decl. ¶ 7). Although Sunbelt maintains that a copy of the Rental–Out was signed "[i]n most cases," (Cardinale Dep. at 50), it has produced only one Rental-Out, relating to the May 2008 rental, for which the signature of a Shepard representative can be authenticated, (Potashner Aff. Ex. 3 at LM 1691).[4] As Cardinale admitted, Sunbelt's drivers were not always required to obtain a signature to deliver equipment, and they sometimes returned with one or both of the Rental–Out copies unsigned.[5] (Cardinale Dep. at 51, 57).

---

3. Sunbelt also created a "Rental Return form," a "Pickup Ticket form," and an "Equipment Conditions Report" with respect to each rental. (Cardinale Decl. ¶¶ 8–10).

4. The May 2007 Rental–Out is unsigned. (Postashner Aff. Ex 1 at LM 1669). The December 2007 Rental–Out contains a signature that Shepard's employees did not recognize. (*See id.* Exs. 2 at LM 1683 & 16 at 34–36). The July 2008 Rental–Out contains the apparent manual signature of a Shepard employee, but, as set forth below, that employee apparently never signed it. (Strauss. Aff. Ex. G. at LM 24).

5. Shepard's Operations Manager, John Espinosa ("Espinosa"), testified that "most of the times, [Sunbelt's drivers] come and don't leave the paper [*i.e.*, the Rental–Out]." (Strauss Aff. Ex. H at 59). He also admitted, however, that he was not at the job site when the Sunbelt deliveries occurred. (Potashner Aff. Ex. 16 at 42–43, 72–73). It therefore appears that his testimony concerning the Rental–Outs is inadmissible hearsay.

Even when Shepard received Rental–Outs at the time of the Sunbelt equipment deliveries, Shepard's field personnel did not transmit them to Shepard's main office. Instead, any papers other than invoices that were associated with the Sunbelt rentals were retained at the work site and eventually were lost or destroyed. (Potashner Aff. Exs. 16 at 43–44, 84–85 & 17 ("Palma Dep.") at 24–25).

Prior to the ill-fated July 2008 rental, Shepard had reserved a 60–foot articulating manlift on May 28, 2008. (*Id.* Ex. 3 at LM 1687; Cardinale Decl. ¶ 25). When equipment such as the manlift was being delivered to one of its work sites, Shepard's Operations Manager would instruct the Shepard foreman on duty to sign for the equipment. (Potashner Aff. Ex. 16 at 9–11, 37, 53, 73–76). Gilberto Palma ("Palma") was the foreman on duty when the May 2008 delivery took place, and he signed the Rental–Out on behalf of Shepard. (*Id.* Exs. 3 at LM 1691 & 16 at 14, 48–49, 51, 76–77; Palma Dep. at 8, 21–23, 41–44). The 60–foot manlift later was returned to Sunbelt on June 3, 2008. (Potashner Aff. Ex. 3 at LM 1693–94; Cardinale Decl. ¶ 30).

On July 25, 2008, Shepard's office manager, Joan Taylor ("Taylor"),[6] telephoned Sunbelt to request that an 80–foot articulating manlift be delivered to the World Financial Center. (Strauss Aff. Exs. D at 27, 60 & G at LM 22). Her conversation with the Sunbelt representative who took the New York, New York 10175(212) 682–9380(fax) order was limited to such details as the time of delivery, the length of the rental, and pricing. (*Id.* Ex. D at 60–61). Accordingly, she and the Sunbelt representative did not discuss any insurance or indemnification requirements. (*See id.* at 106).

On July 28, 2008, Sunbelt delivered the 80–foot manlift to Shepard at the World Financial Center. (*See id.* Ex. G at LM 24). It is unclear, however, whether a Rental–Out was presented to Shepard along with the lift. A July 2008 Rental–Out proffered by the Plaintiffs bears the hand-printed name "Jhoan Taylor" to the right of what appears to be a signature, but Taylor made neither of those entries. (*See id.* Exs. D at 81–84, 104–05 & G at LM 24). Indeed, Taylor was not present at the World Financial Center work site. (*See id.* Ex. D at 46). Sunbelt's driver, William Bilson, also admits that he never delivered a Sunbelt lift to any female at the World Financial Center. (*Id.* Ex. J at 36, 39–40).

After the accident, Sunbelt's counsel sought information from Shepard concerning Shepard's insurance coverage. (Potashner Aff. Ex. 7). A Travelers representative responded by letter dated August 22, 2008. (*Id.* Ex. 8). In that letter, Travelers claimed that Sunbelt did not qualify as an additional insured under Shepard's primary and excess policies "because there was no written contract executed prior to the loss" and because "it is possible that the accident arose out of the sole negligence of Sunbelt." (*Id.*). Following the commencement of the Fabrizio Action, the Plaintiffs sent additional letters requesting reconsideration of Travelers' decision to disclaim coverage. (*Id.* at Exs. 9, 11, 12). Those requests were either rejected or ignored. (*See id.* Ex. 10 (letter dated Nov. 21, 2008, from Travelers representative to Liberty Mutual stating: "There is no reason for me to reconsider my position. Nothing has changed.")).

After failing to persuade Travelers to provide coverage, the Plaintiffs commenced this declaratory judgment action against Charter Oak on July 8, 2010.

6. Taylor presently uses the surname Fitch.

(Strauss Aff. Ex. D at 6).

(ECF No. 1). In September 2010, the Plaintiffs filed an Amended Complaint naming St. Paul as an additional defendant. (ECF No. 11). Following the close of discovery on June 24, 2011, (*see* ECF Nos. 28, 29), the parties served and filed their cross-motions for summary judgment, (ECF Nos. 30, 33), which are now fully submitted.

## III. *Discussion*

### A. *Standard of Review*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact" based on supporting materials in the record. Fed.R.Civ.P. 56. "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The nonmoving party therefore cannot defeat a motion for summary judgment simply by relying upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party. *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 78 (2d Cir.2002); *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir.1997). The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. *See Beyer v. Cnty.*

*of Nassau*, 524 F.3d 160, 164 (2d Cir.2008). Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court. *Fischl*, 128 F.3d at 55; *see also* Fed.R.Civ.P. 56(e) 1963 advisory committee's note. Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." *Fischl*, 128 F.3d at 55.

The fact that both sides have moved pursuant to Rule 56 does not mean that one side necessarily must be granted summary judgment. *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 313–14 (2d Cir.1981). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* at 314.

### B. *Choice of Law*

■ Although the terms and conditions on the back of Sunbelt's paperwork state that its contract with Shepard "shall be governed by the laws of the State of North Carolina," (*e.g.*, Potashner Aff. Ex. 3 at LM 1692 ¶ 20), both sides have relied almost exclusively on New York law in their motion papers and cite no North Carolina law whatsoever. In these circumstances, the Court also will apply New York law to decide the questions presented by the cross-motions. *See, e.g., Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 n. 4 (2d Cir.2005) (assuming that New York law applies because the parties cite only New York law); *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 294 (2d Cir. 1986) (court is not obliged to undertake an investigation of potential differences between New York and California law and may instead apply New York law when that is the sole law cited by the parties).

## C. Shepard's Duty to Sunbelt

 Whether Shepard's carriers had a duty to defend or indemnify Sunbelt presents issues of contract law. To form a valid contract under New York law, there must be "an offer, acceptance, consideration, mutual assent and intent to be bound." *Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC*, 760 F.Supp.2d 384, 397 (S.D.N.Y.2011) (citing *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F.Supp.2d 329, 337 (S.D.N.Y.2006)). Mutual assent in turn requires "a meeting of the minds of the parties" on all essential terms. *Id.* at 397. Whether such an accord exists "is a question of fact that must be resolved by analyzing the totality of the circumstances." *Benicorp Ins. Co.*, 447 F.Supp.2d at 337 (citing *United States v. Sforza*, 326 F.3d 107, 116 (2d Cir.2003)).

 When a court is asked to interpret the provisions of an existing contract, the threshold question under New York Law "is whether the contract is ambiguous." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). Ambiguity is a "question of law to be resolved by the court." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 148–49 (2d Cir.1993). "[A] contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Lockheed Martin*, 639 F.3d at 69. When a contract is unambiguous, "it must be enforced according to the plain meaning of its terms." *Id.* Thus, in such circumstances, "the court need not look to extrinsic evidence of the parties' intent or to rules of construction to ascertain the contract's meaning." *Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2d Cir.1984).

## 1. Charter Oak Policy

 The parties do not dispute that the Fabrizio Action triggers a duty to defend Sunbelt if Sunbelt is an "additional insured" as that term is defined in the Charter Oak Policy. The sole issue with respect to Charter Oak therefore is whether Sunbelt qualifies as such an additional insured. As noted earlier, under the Charter Oak Policy, Sunbelt is an additional insured if Shepard "agreed in a written contract, *executed prior to loss,* to name [Sunbelt] as an additional insured," provided that the loss does not occur as a result of the sole negligence of Sunbelt. (Strauss Aff. Ex. K at D0095–96) (emphasis added). Thus, to qualify for additional insured status under the Charter Oak Policy, Sunbelt must first establish the existence of a written contract executed by the parties pursuant to which Shepard agreed to name Sunbelt as an additional insured. In that regard, the Plaintiffs do not contend that the July 2008 Rental–Out constituted such an "executed" contract. They nevertheless maintain that the May 2008 Rental–Out signed by Palma satisfies this Charter Oak Policy condition precedent.

In response, the Defendants evidently do not question the authority of Palma to agree to the terms and conditions of the May 2008 Rental–Out on Shepard's behalf. The Defendants argue, however, that the May 2008 Rental–Out cannot control the parties' obligations under the July 2008 Rental–Out because "incorporation of one document into another may only be found if (i) the agreement in question (here the May 2008 Rental–Out contract) specifically refers to the document being incorporated (here the later July 2008 rental of the 80 foot articulating lift) such that the document being incorporated 'may be *identified beyond all reasonable doubt*' in the parties' contract in question . . .; and (ii) it is 'clear that the parties to the agreement

had knowledge of and assented to the incorporated terms.'" (ECF No. 39 (Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.")) at 21 (quoting *Paine-Webber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir.1996)) (emphasis in *PaineWebber*) (also citing, *inter alia, Ryan, Beck & Co., LLC v. Fakih*, 268 F.Supp.2d 210, 223 (E.D.N.Y.2003))).

The doctrine of incorporation by reference is not directly applicable here. Had the May 2008 Rental–Out incorporated by reference terms that could be found *only* in the as-yet inchoate July 2008 Rental–Out, any attempt by the Plaintiffs to rely on the doctrine plainly would have been misplaced because Shepard could not have had any knowledge of, much less assented to, terms that had yet to be reduced to writing when the May 2008 Rental–Out was signed. Here, by comparison, the insurance requirements were plainly set forth in a document that Shepard was aware of and that Palma, its authorized agent, had signed, thereby manifesting Shepard's assent. Moreover, the transactions to which the insurance requirements applied were clearly delineated as *"all future contracts"* between Sunbelt and Shepard pursuant to which Shepard made use of Sunbelt's equipment. (Potashner Aff. Ex. 3 at LM 1692 ¶ 1) (emphasis added). Additionally, although there is no evidence that Shepard actually signed the July 2008 Rental–Out, there is testimony that it was Sunbelt's practice—sometimes honored in the breach—to send copies of the Rental–Outs to its customers along with the equipment being leased. If that practice was followed in July, Shepard had an additional reminder that the same terms and conditions were applicable to the July 2008 rental. *See Grosvenor v. Qwest Corp.*, —— F.Supp.2d ——, —————, No. 09–cv–2848–MSK–KMT, 2012 WL 602655, at *7-8 (D.Colo. Feb. 23, 2012) (holding that prior "clickwrap" agreement applied to software upgrade even if it constituted a

new contract because a "Welcome Letter" put the plaintiff on notice that use of the software constituted continued assent to the agreement's terms). In these circumstances, Shepard is bound by its prior assent to Sunbelt's terms and conditions.

There also is no basis for the Defendants' contention that Shepard's obligations under the May 2008 Rental–Out, including those relating to insurance, had come to an end before the July 2008 rental because Sunbelt's terms and conditions clearly state that "[t]he Rental Period and this Contract shall not terminate ... until Sunbelt confirms that the Equipment is returned in the condition required herein." (Potashner Aff. Ex. 3 at LM 1692 ¶ 14). The Defendants reason that because the equipment rented in May was returned in satisfactory condition in early June, the May 2008 Rental–Out (including its insurance requirements) necessarily terminated before the July 2008 rental occurred. (ECF No. 50 (Defs.' Reply) at 4–6). In making this argument, the Defendants fail to draw a distinction between the use of the term "equipment" generically and its use as a (capitalized) defined term in the Sunbelt terms and conditions. Although it is true that Shepard's obligations with respect to rented "Equipment" terminated when it was accepted for return, the term "Equipment" is defined, insofar as relevant, as the "equipment and/or services identified on the front of this Contract." (Potashner Aff. Ex. 3 at LM 1692 ¶ 1). By comparison, the language incorporating the terms and conditions of the May 2008 rental into future rental agreements uses the generic form of the term, stating expressly that Sunbelt's insurance requirements will be incorporated into future contracts as soon as Shepard uses any such "equipment." (*Id.*). Since the drafter of the terms and conditions did not use the defined term in connection with this undertaking, it would be illogical to conclude that the termination of the contract with

respect to a prior rental precludes incorporation of Sunbelt's standard terms and conditions—including those relating to insurance—into future equipment rentals. Indeed, the sentence stating that the terms and conditions will be applied to future "equipment" rentals appears to be the only place in Sunbelt's boilerplate (other than the sentence defining "Equipment") where the generic form of the term is employed.

In sum, by virtue of the May 2008 rental, Shepard had entered into an unambiguous "written agreement, executed prior to loss," that obligated it to name Sunbelt as an additional insured on its liability insurance policies in connection with all future rentals. Charter Oak consequently must provide coverage with respect to the Fabrizio Action, which arose out of a future rental. At this stage of the Fabrizio Action, this means that Charter Oak must furnish Sunbelt with a defense. Later, if Sunbelt is found liable to the Fabrizios, Charter Oak also will have to indemnify Sunbelt, to the extent of its policy limits, unless the verdict establishes that the loss is attributable solely to Sunbelt's negligence.

### 2. St. Paul Policy

■ The St. Paul Policy provides that St. Paul will pay on behalf of "Insured" entities any liabilities that exceed the Insured's "Retained Limit." (Strauss Aff. Ex. L at D0183). The St. Paul Policy's definition of the term "Insured" includes, in addition to Shepard, "any person or organization . . . included as an additional insured on any **Scheduled Underlying Insurance**." (*Id.* at D0188 ¶ IV.J.2) (emphasis in original). Since the Charter Oak Policy is listed on the Schedule of Underlying Insurance annexed to the St. Paul Policy, (*id.* at D0210), Sunbelt is an "Insured" under the St. Paul Policy because it qualifies as an additional insured under the Charter Oak Policy.

The St. Paul Policy issued to Shepard further defines the term "Insured" to include:

any person, organization, trustee or estate to whom you are obligated by a written contract or agreement to provide insurance such as is afforded by this policy but only with respect to liability arising out of

a. **Your Work;** or

b. facilities owned or used by you.

(*Id.* at D0188 ¶ IV.J.5) (emphasis in original). "Your Work," in turn, is defined as follows

1. work or operations performed or being performed by you or on your behalf; and

2. materials, parts or equipment furnished in connection with such work or operations.

(*Id.* at D0193).

There is no question that the claims in the Fabrizio Action arise out of "Your Work" within the meaning of the St. Paul Policy issued to Shepard. Indeed, when the Fabrizios suffered their injuries, they were acting as Shepard subcontractors to perform window-washing work using a manlift that Shepard had rented so that they could complete that task. Accordingly, Sunbelt qualifies as an "Insured" under the St. Paul Policy, provided that Sunbelt and Shepard had entered into a "written contract or agreement" that required Shepard to provide insurance coverage to Sunbelt.[7] Here, for the reasons noted

---

7. Both sides agree that, unlike the Charter Oak Policy, the St. Paul Policy does not further require that such an agreement be "executed prior to loss" for Sunbelt to be insured. (*See* ECF No. 47 (Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Mem.")) at 11 (citing *10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 124 (2d Cir.2011)); Defs.' Mem. at 15, 20).

above, the May 2008 Rental–Out qualifies as such an agreement. St. Paul therefore also must provide a defense for Sunbelt and potentially indemnity if its layer of coverage is reached.

### D. *Primacy of Coverage*

The remaining question is whether the Charter Oak Policy and St. Paul Policy apply primary to the Liberty Mutual Policy. The Plaintiffs contend, in that regard, that because Liberty Mutual is not exposed to any real risk transfer under its "fronting" policy, the Charter Oak Policy and St. Paul Policy should be considered the sole insurance coverage available to Sunbelt. (Pls.' Mem. at 14–17; Pls.' Reply at 8–10).

■ This issue is not a difficult one to resolve in relation to the Charter Oak Policy. That Policy contains an endorsement which provides that

if you specifically agree in a written contract or written agreement that the insurance provided to an additional insured under this Coverage Part must apply on a primary basis . . ., this insurance is primary to other insurance that is available to such additional insured which covers such additional insured as a named insured, and we will not share with that other insurance, provided that

a. The "bodily injury" or "property damage" for which coverage is sought occurs . . . subsequent to the signing and execution of that contract or agreement by you.

(Strauss Aff. Ex. K at D0079) ("Other Insurance—Additional Insureds" endorsement to CGL policy) (emphasis omitted).

The May 2008 Rental–Out specifically provided that, in connection with all future rentals, Shepard would cause Sunbelt to be named as an additional insured on a general liability insurance policy providing coverage of "not less than $1,000,000 per occurrence," and that "[s]uch policies shall be primary (and not on an excess basis)." (Potashner Aff. Ex. 3 at LM 1692 ¶ 9). Accordingly, whether or not the Liberty Mutual Policy provides any real insurance, the Charter Oak Policy must provide primary coverage, without any sharing with Liberty Mutual, provided that the Fabrizios' damages arose of an accident that took place "subsequent to the signing and execution" of a Rental–Out requiring that the Charter Oak Policy respond as the primary policy. (*See* Strauss Aff. Ex. K at D0079). The May 2008 Rental–Out qualifies as such an agreement. Charter Oak therefore must provide primary coverage.

■ Turning to the St. Paul Policy, which provides umbrella coverage, the Plaintiffs argue that the matching $2 million coverage limit and $2 million deductible under the Liberty Mutual Policy establish that there is no risk transfer and, hence, no "insurance" that could be considered primary to the St. Paul Policy. (Pls.' Mem. at 14–17; Pls.' Reply at 8–10). The Defendants counter that there are at least two instances in which Liberty Mutual—as opposed to Sunbelt—will have to respond to the Fabrizios' claims. (ECF No. 46 (Defs.' Opp'n Mem.) at 17–19). First, as Section 3420(a)(1) of the New York Insurance Law requires, the Liberty Mutual Policy provides that the bankruptcy or insolvency of Sunbelt will not relieve Liberty Mutual of its obligations under the Sunbelt Policy. (Potashner Aff. Ex. 6 at LM 1656 ("Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this [CGL] Coverage Part.")). Liberty Mutual therefore

will have to provide indemnification to the Fabrizios if Sunbelt is declared bankrupt or becomes insolvent.

Second, pursuant to Sections 3420(a)(2) and (b)(1) of the New York Insurance Law, the Fabrizios' estates will be able to sue Liberty Mutual directly should they obtain a judgment in the Fabrizio Action that remains unsatisfied for thirty days. *Lang v. Hanover Ins. Co.*, 3 N.Y.3d 350, 354–55, 787 N.Y.S.2d 211, 820 N.E.2d 855 (2004).

There is no suggestion, however, that Sunbelt is having any financial problems that might require Liberty Mutual to pay the Fabrizios directly. Accordingly, if the Liberty Mutual Policy is primary to the St. Paul Policy, the funds at that tier of coverage likely will come directly from Sunbelt by virtue of the matching coverage and deductible amounts under the Liberty Mutual Policy.

In *Insurance Company of North America v. Pyramid Insurance Company of Bermuda Ltd.*, No. 92 Civ. 1816(SS), 1994 WL 88701 (S.D.N.Y. Mar. 16, 1994), then-District Judge Sotomayor had occasion to consider the effect of purchasing a "fronting" policy. Conducting a bench trial on the basis of agreed facts contained in a pretrial order, Judge Sotomayor noted the testimony of a former risk manager that, while such arrangements "may seem strange," they "are commonplace in the risk-management programs of large companies." *Id.* at *4. As the risk manager explained, the arrangements allow such companies to pay for their own losses until they reach the level of excess insurance policies, while at the same time ensuring that "claims administration and defense of litigation [would be] handled in a consistent, easily understood fashion." *Id.* (brackets in original). Judge Sotomayor

concluded that fronting policies "which do not actually transfer risk to the insurer but serve other purposes are very much a custom in the industry." *Id.* Deciding the question under California law, Judge Sotomayor held that the issuer of the fronting policy would not be held liable to a carrier that had issued primary and excess liability insurance policies covering their common insureds. *Id.* at *1, *4–5, *7.

The situation here is somewhat distinguishable. First, the Liberty Mutual Policy, although plainly intended to provide the first dollars to be paid in response to a claim, expressly provides that it is excess over "[a]ny other primary insurance available to [Sunbelt] … for which [Sunbelt] ha[s] been added as an additional insured by attachment of an endorsement." (Potashner Aff. Ex. 6 at LM 1657). Since neither side has adduced any evidence as to the issuance or non-issuance of an endorsement to the St. Paul Policy regarding Sunbelt, the Court cannot resolve the priority of coverage issue based on the Liberty Mutual Policy language.

The St. Paul Policy also contains language concerning this issue. Thus, the St. Paul Policy provides coverage for an "Insured," a term which includes Sunbelt, (*see* Strauss Aff. Ex. L at D0188), for "all sums in excess of the Retained Limit" (*id.* at D0183) (emphasis omitted). "Retained Limit," in turn, is defined in the St. Paul Policy to include "Other Insurance," (*id.* at D0183), including any "alternative risk transfer, risk *management* or financing methods or programs, such as risk retention groups or self-insurance methods or programs" (*id.* at D0190) (emphasis added). Since it appears that the Liberty Mutual Policy, at a minimum, was purchased to assist with risk management, pursuant to the St. Paul Policy, St. Paul's

coverage is excess to the Liberty Mutual Policy. *Cf. Nabisco, Inc. v. Transp. Indem. Co.*, 143 Cal.App.3d 831, 192 Cal. Rptr. 207, 208–09 (1983) (concluding that self-insurance is "other insurance" under a policy which explicitly stated that its coverage was excess if there was "other insurance or self-insurance").

IV. *Conclusion*

Based on the foregoing, the Plaintiffs' motion for partial summary judgment, (ECF No. 30), is granted insofar as it seeks a declaration that Charter Oak and St. Paul must defend and indemnify Sunbelt in connection with the Fabrizio Action, and insofar as it seeks a declaration that the Charter Oak Policy must respond on a primary basis, but denied insofar as it seeks a declaration that the St. Paul Policy also is primary. The Defendants' cross-motion for summary judgment, (ECF No. 33), which seeks dismissal of the Plaintiffs' claims, is denied.

The Court will hold a conference in Courtroom 6A, at 2 p.m. on April 3.2012, to determine whether there are additional issues that must he addressed before this case is closed.

SO ORDERED.

