Saxe and Catterson, JJ.,
dissent in a memorandum by Catterson, J., as follows: I am compelled to dissent because I believe that the contingent fee agreement is ambiguous and that there are issues of fact over the intent of the parties. The brief exchange of emails that formed the substance of the fee agreement is susceptible to more than one interpretation. Thus, I believe that summary judgment is particularly inappropriate in this case.
Plaintiff law firm Kasowitz, Benson, Torres & Friedman, LLP (hereinafter referred to as Kasowitz) commenced this action to recover contingent fees allegedly owed as a result of legal services it performed for defendants Duane Reade and Duane Reade, Inc. (hereinafter collectively referred to as Duane Reade). In order to put the fee dispute in context, a recitation of the facts is warranted.
In August 2003, Duane Reade entered into an agreement with Cardtronics, an operator of automated teller machines (ATMs), for the placement, maintenance and management of ATMs in Duane Reade’s stores. The agreement entitled Duane Reade to half of all transaction surcharges collected from customers using the ATMs. In December 2003, the parties amended their agreement to reflect “bank branding” of Cardtronics ATM machines by a “large well-known financial institution” and to extend the term to December 2014 (the Cardtronics agreement).
In March 2005, Cardtronics entered into a branding agreement with JP Morgan Chase to place Chase’s name and trademark on the ATMs in Duane Reade’s stores. Prior to the branding, all customers paid a surcharge for each ATM transaction. As a result of the branding, Chase customers were no longer required to pay the user transaction surcharge. To compensate Duane Reade for the surcharge fees lost as a result of the branding, Cardtronics agreed to pay Duane Reade using a different calculation method.
Sometime thereafter, a fee dispute arose over Duane Reade’s claim of underpayment of the surcharge fees under the *408 Cardtronics agreement. Cardtronics sought to pay Duane Reade based on a fixed number of transactions for the remaining life of the contract, whereas Duane Reade sought to determine the amount of transactions on a month-to-month basis.
In March 2006, Michelle D. Bergman, Esq., Duane Reade’s senior vice-president and general counsel, asked Daniel E Goldberg, an attorney with Kasowitz, to represent Duane Reade in an action against Cardtronics to recover the surcharge fees. On September 8, 2006, Goldberg emailed Bergman a proposed fee arrangement by which Kasowitz would charge a flat fee of $1 million, payable in 10 installments, plus disbursements, for the potential Cardtronics litigation. The email also provided for a “success fee,” which was a contingency fee equal to 20% of the damages Duane Reade recovered against Cardtronics “over the life of the [Cardtronics contract]” in excess of $4 million (hereinafter referred to as the fee agreement). The email, in part, stated:
“We can do the Cardtronics case for a flat $1 million, payable over 10 months as you suggested (exclusive of disbursements), plus 20% of amounts recovered above some number, as opposed to a percentage payable from dollar one.
“Based on the numbers we have, which obviously are approximations, we actually think the damages could be between $10 and $11 million over the life of the contract. So, I’m thinking of 20% of everything above $4 million as the success fee portion. Thus, if we get $10 million, the total fee would be $2.2 million (with you keeping $7.8 million obviously). That’s $1 million in flat fee, plus $1.2 million in success fee.
“That’s actually a bit lower than what I had previously suggested of a discount off of time plus 20%. That is, if we did 60% of time plus 20% contingency from dollar one, and we recover $10 million, our total fee would be $2.9 million (assuming our actual hourly would come to $1.5 million, 60% of which is $900,000; leaving $900,000 in time charges, plus $2 million in success fee). Even if the recovery is $5 million (settlement or what have you), the total fee would be $1.2 million, which is still a discount of a few hundred thousand based on ‘splitting the baby.’ What do I need to do to put you in a new lawsuit today?
“By the way, as to our discussion about it being a ‘binary’ case of either we win it all or lose it all, though in large part that’s true, the damage question is not entirely irrelevant. We’re saying that we should get paid based on the actual amount of transactions; figuring that out likely will be disputed before we’re done.” Bergman responded that it was an “interesting *409 proposal,” and that she would talk to Rick (referring to Duane Reade’s then-chief executive officer, Rick Dreiling).
On September 19, 2006, Goldberg sent an email to Bergman in which he stated, in relevant part, “I would love to have our fee arrangement in place by then so I can just tear into these guys.” In an email response to Kasowitz that same day, Bergman wrote “Go.” These emails are the total written communication of the parties concerning the fee agreement prior to the commencement of the representation.
In October 2006, Kasowitz filed a new complaint on Duane Reade’s behalf seeking damages from Cardtronics for its miscalculation and underpayment of the surcharge fees; it did not seek rescission or termination of the Cardtronics agreement. On September 21, 2007, the court granted Cardtronics’ motion to dismiss and denied Duane Reade’s motion for summary judgment (Duane Reade, Inc. v Cardtronics, LP, 17 Misc 3d 1101[A], 2007 NY Slip Op 51785[U] [Sup Ct, NY County 2007]). Kasowitz filed an appeal on behalf of Duane Reade in which it stated in its appellate brief that the Cardtronics action was “a straight-forward commercial dispute over the meaning of discrete contractual language.” We reversed the motion court’s order dismissing the Cardtronics action, finding that the provision at issue in the Cardtronics agreement was ambiguous (54 AD3d 137 [1st Dept 2008]). In October 2007, Duane Reade made its final $100,000 installment payment to Kasowitz, completing payment of the $1 million flat fee.
In September 2008, Duane Reade sought Kasowitz’s legal advice on whether the Cardtronics agreement could be terminated. In an email dated September 18, 2008, Kasowitz stated that it had reviewed the Cardtronics agreement “in search of any provisions that Duane Reade might utilize to cancel the Cardtronics relationship.” In that email, Kasowitz advised that the complaint would need to be amended in order to terminate the Cardtronics agreement through the lawsuit.
By letter dated October 24, 2008, Duane Reade advised Cardtronics that it was in default under the terms of the Cardtronics agreement, and that it would “pursue ... its right to terminate the ATM Placement Agreement” unless Cardtronics remedied its defaults.
In November 2008, Duane Reade replaced Bergman as general counsel. The new general counsel began negotiating directly with Cardtronics on matters concerning the parties’ relationship, including a possible reassignment of the ATM machines to Chase. It is undisputed that Kasowitz was not involved in these negotiations.
*410 On February 13, 2009, Duane Reade and Cardtronics agreed to settle the Cardtronics litigation. The terms of the settlement included payment by Cardtronics of $1 million to Duane Reade by March 2009, dismissal of the pending Cardtronics action, and termination of the Cardtronics agreement. Although Kasowitz was not involved in the settlement negotiations, Duane Reade contacted Kasowitz and requested that it draft the final settlement agreement.
On February 18, 2009, Goldberg emailed Duane Reade’s general counsel the draft settlement documents. He also inquired about the “success fee” that Kasowitz was to receive, indicating that the litigation had been used to effect the result of termination and that Duane Reade’s direct deal with Chase was “far more profitable” than the Cardtronics deal. On March 23, 2009, general counsel emailed Goldberg, informing him that Duane Reade still did not have a deal with Chase, and that the litigation was being settled on the basis of the $1 million payment from Cardtronics to Duane Reade, as agreed to on February 13, 2009.
On May 8, 2009, Duane Reade and Cardtronics finalized their settlement agreement and, on the same date, entered into a third amendment of the Cardtronics agreement, which created a five-month transition period for the removal of Cardtronics’ ATM machines from Duane Reade’s stores. During this five-month period, the ATM surcharges for non-Chase users were increased from $0.99 to $1.99, and Duane Reade received $1 per ATM transaction, as opposed to its previous receipt of $0.50 per transaction.
In addition, on May 8, 2009, Duane Reade and Chase entered into an ATM license agreement by which Chase would place its own ATMs in Duane Reade stores, in place of Cardtronics’ ATMs. Under the terms of the new agreement, Duane Reade received $3 million as the first installment of the “Initial Term License Fee,” and would receive $3.5 million in the sixth year, a license fee for the five-year renewal term of $3.5 million inflated by either the consumer price index or 3% each year, and monthly payments of a fee equal to the product of $0.99 multiplied by all “Allpoint Network Withdrawals” made each month at “Agreement ATMs.” Thus, the original agreement with Cardtronics was entirely supplanted by an agreement between Duane Reade and Chase.
Ultimately, Kasowitz demanded that Duane Reade compensate Kasowitz for a portion of the success fee and Duane Reade refused. This litigation ensued. Both parties moved for summary judgment and the motion court ruled in favor of Duane *411 Reade. The motion court concluded that there was a success fee agreement between the parties and that the action was settled in Duane Reade’s favor. Furthermore, the settlement entitled Duane Reade to the $1 million in cash and termination of the original Cardtronics agreement. The court also agreed with Kasowitz that Kasowitz was responsible for achieving that result. The court found that Kasowitz was not entitled to a success fee on the grounds that the $4 million threshold described in the original email from Goldberg to Bergman was simply not reached.
The motion court reasoned that “Kasowitz argues that it should be compensated for the ‘packaged deal’ between Duane Reade, Chase and Cardtronics that occurred as a result of Duane Reade terminating with Cardtronics.” The motion court rejected the argument that the Chase agreement was part and parcel of the Cardtronics agreement and thus denied Kasowitz any success fee attributable to the Chase agreement. Unfortunately, in my view, the motion court and the majority misapprehend Kasowitz’s argument. Such confusion requires reversal.
The question presented by the appeal is twofold: whether the exchange of emails constitutes a unitary agreement, and, if the exchange does indeed constitute a unitary agreement, are the terms of that agreement unambiguous?
I agree with the motion court and the majority on the former question that the exchange of emails constitutes a unitary fee agreement. The original September 8th email proposed a flat fee of $1 million payable in installments by Duane Reade, “plus 20% of amounts recovered above some number, as opposed to a a [sic] percentage payable from dollar one.” Bergman’s response, although not referenced to the September 8 email, was a simple “Go.” Bergman submitted an affidavit in support of Kasowitz’s motion for summary judgment wherein she stated that “Go” was tantamount to Duane Reade’s acceptance of Kasowitz’s proposed terms. It must be recognized that at the very outset, it was necessary to resort to extrinsic evidence to establish that “Go” constituted Duane Reade’s acceptance. The majority posits that I have “improperly reli[ed] on extrinsic evidence, including Bergman’s affidavits, in order to find ambiguity where none exists.” There are several problems with this contention. First, as pointed out above, Bergman’s affidavit is necessary to interpret the monosyllabic command “Go.”* There is no other way to attribute “Go” to acceptance of Goldberg’s emails. Only Bergman, the author of “Go” could establish that “Go” constituted Duane Reade’s acceptance.
*412 Secondly, when read together as Bergman’s affidavit and Duane Reade’s argument on appeal propose, the emails evince an intent on the part of both parties to be bound to some fee for legal services. Based on the actual text of the emails, the scope of that fee is, in my view, uncertain because the language is ambiguous. The key term at issue is “recover.” Kasowitz urges that “the term is not limited to monetary recovery alone and expressly contemplates equivalent value achieved as a result of a settlement or otherwise.” In support of this contention, Kasowitz cites a series of decisions permitting a contingent fee as against noncash resolutions. (See e.g. Beatie v DeLong, 164 AD2d 104 [1st Dept 1990] [contingent fee arrangement for vindicating rights to five different patents].)
Kasowitz also relies on the Bergman affidavit submitted in support of Kasowitz’s summary judgment motion. In that affidavit, Bergman maintained that Duane Reade understood that the value of the termination of the Cardtronics litigation was more than simply getting out of its contractual obligations. Bergman stated that the “actual value of such termination . . . would hinge on the deal we were able to obtain to replace the Cardtronics agreement.” Further, Bergman stated that the actual value would be “worked out and calculated at the appropriate time, if a termination ended up being part of a resolution.”
The motion court rejected the Bergman affidavit as “self-serving.” In my view, this was clear error for many reasons. It is undisputed that Bergman was not only Duane Reade’s general counsel and senior vice-president at the time the agreement was negotiated, but she was also the sole employee of Duane Reade who negotiated the very agreement at issue. Bergman was the only person on Duane Reade’s side with personal knowledge who was involved in the transaction. Bergman’s first affidavit was provided pre-litigation and the second affidavit, which was submitted in support of the motion for summary judgment, reaffirmed Bergman’s view of the elements of the agreement.
It is beyond dispute that Bergman’s affidavit cannot be categorized as “self-serving.” Bergman is not a party to the action, is not employed by either party, and on the facts of this record, has no interest in the outcome of the litigation, financial or otherwise. Most importantly, Duane Reade has offered no sworn testimony from anyone to contradict either Bergman affidavit. The only evidence put forward by Duane Reade was the *413 affirmation of its own counsel which was not based on personal knowledge; counsel’s first involvement with the case was over three years after the agreement was negotiated. At the very least, it is reversible error to have refused to consider the Bergman affidavits because of the characterization of them as “self-serving.”
Finally, on the question of the veracity of the Bergman affidavits, it is hornbook law that Bergman’s credibility can only be tested through a trial, not on a motion for summary judgment where, as here, factual averments are uncontested. (Santos v Temco Serv. Indus., 295 AD2d 218 [1st Dept 2002].)
The majority’s only possible justification for rejecting Bergman’s affidavits is the contention that the terms of the contingent fee agreement were unambiguous. The motion court found that Goldberg’s use of the expressions “numbers” and “life of the contract” could only refer to “damages based purely on litigating with Cardtronics to enforce the contract with Duane Reade and Cardtronics in Duane Reade’s favor.”
The majority adopts this analysis, holding that “[the language in the fee agreement] states the precise fee arrangement.” There is simply nothing in the Goldberg emails that is “precise.” Once again, the language of the emails is important. What is “precise” about the email exchange is that neither Goldberg nor the monosyllabic Bergman ever settled on what would be the basis for the contingent fee. Goldberg wrote about calculating the fee based on damages to Duane Reade, not simply the amount claimed in the contract action. Indeed, after discussing various calculations based on different “recovery” scenarios, Goldberg asked, “What do I need to do to put you in a new lawsuit today?” That question, as well as the permutations on the contingent fee question, was answered by “Go.”
Even were I to agree with the motion court and the majority that “numbers” and “life of the contract” were susceptible of only one meaning, Kasowitz persuasively argues that “recovery” can mean many things. In Kass v Kass (91 NY2d 554, 566 [1998]), the Court of Appeals cautioned that we must examine “the entire contract and consider the relation of the parties and the circumstances under which it was executed” (internal quotation marks omitted). Furthermore, in parsing the actual words used by the parties, we must necessarily consider the written word “in the light of the obligation as a whole and the intention of the parties as manifested thereby.” (Kass, 91 NY2d at 566.) Thus, a dispute over the meaning of “recovery” can only be resolved through the prism of the parties’ intent at the time.
Bergman’s and Goldberg’s affidavits, when read in conjunc *414 tion with the disjointed language of the emails, create issues of fact that surely survive a motion for summary judgment.

 It is also interesting to note that Duane Reade originally argued to the motion court that the agreement was ambiguous. On appeal, however, Duane *412 Reade now argues that the agreement is “a clear, complete and unambiguous statement of the intent of the parties.” In part, I agree.