Bledsoe v Center for Human Reproduction (2024 NY Slip Op 02088)

Bledsoe v Center for Human Reproduction

2024 NY Slip Op 02088

Decided on April 18, 2024

Appellate Division, First Department

Shulman, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: April 18, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Jeffrey K. Oing
Lizbeth González Martin Shulman Bahaati E. Pitt-Burke John R. Higgitt

Index No. 800212/11 Appeal No. 1619 Case No. 2023-00146 

[*1]Dana Bledsoe et al., Plaintiffs-Appellants,
v
Center for Human Reproduction et al., Defendants-Respondents, Kutluk Han Oktay, M.D., Defendant.

Plaintiffs appeal from an order of the Supreme Court, New York County (John J. Kelley, J.), entered December 9, 2022, which granted the motion of defendants Center for Human Reproduction, American Infertility of New York, P.C., Helen Shi Zhong, and Jaime Lee for summary judgment dismissing the complaint against them.

Kramer, Dillof, Livingston & Moore, New York (Matthew Gaier and John D. Cagney of counsel), for appellants.
Heidell, Pittoni, Murphy & Bach, LLP, New York (Daniel S. Ratner of counsel), for respondents.

Shulman, J. 

In August 2008, plaintiffs Dana Bledsoe and Nicholas McKee proceeded with an in vitro fertilization (IVF)[FN1] procedure at the Center for Human Reproduction (CFHR) ahead of Ms. Bledsoe's forthcoming chemotherapy. Former defendant Kutluk Han Oktay, M.D. retrieved 14 eggs from Ms. Bledsoe's ovaries by an ultrasound-directed needle aspiration.[FN2] The eggs were fertilized with Mr. McKee's sperm, resulting in nine embryos. Defendants Helen Shi Zhong and Jianming Li (sued herein as Jamie Lee) are embryologists employed by CFHR. Mr. Li is the supervising embryologist who trained Ms. Zhong. Ms. Zhong evaluated the embryos pursuant to CFHR's grading system, grading eight of the embryos as "fair" or "good" quality, and one of the embryos as "poor" quality. Ms. Zhong then cryopreserved the embryos by applying a freezing agent and storing them in CFHR's liquid nitrogen storage tanks. Embryologists checked the tanks twice weekly for leaks and liquid nitrogen levels. Although the embryologists compiled contemporaneous logs reflecting the examinations of the storage tanks, CFHR no longer possesses any logs from 2008 or 2009.
In 2010, plaintiffs were ready to proceed with implanting the embryos and they transported them from CFHR to Yale Fertility Center. Upon thawing the embryos, Yale staff determined that two embryos were missing and three were so degraded or of such poor quality that they had to be discarded. Two of the remaining four embryos were implanted in a gestational carrier but did not result in a pregnancy. The implantation process was repeated using the last two embryos and again was unsuccessful.
Plaintiffs commenced this action on June 24, 2011, 2 years and 10 months after August 11, 2008, the latest date that the causes of action accrued when the embryos were cryopreserved. The complaint includes causes of action for both medical malpractice and ordinary negligence. While not plaintiffs' central issue, both the complaint and bills of particulars plead that defendants were negligent in the storage, maintenance, and preservation of the embryos.
Plaintiffs argue that for their negligence cause of action, the statute of limitations did not expire until August 11, 2011 (CPLR 214 [three-year period]), and that for their medical malpractice causes of action, the statute of limitations was tolled by the "continuous treatment" doctrine until May 12, 2013 (CPLR 214-a [2.5-year period]). Defendants contend that plaintiffs' causes [*2]of action sound only in medical malpractice, that the statute of limitations expired on February 11, 2011, and that the continuous treatment doctrine did not toll the statute of limitations.
In this case of first impression, we must consider which aspects of the IVF process implicate ordinary negligence or medical malpractice. "In applying the statute of limitations, courts must look to the reality or essence of a claim rather than its form" (Annunziata v Quest Diagnostics Inc., 127 AD3d 630, 631 [1st Dept 2015]). The critical factor in distinguishing whether conduct constitutes medical malpractice or ordinary negligence is the nature of the duty owed to the plaintiff that the defendant allegedly breached (id.).
The "distinction between medical malpractice and negligence is a subtle one, for medical malpractice is but a species of negligence" (Weiner v Lenox Hill Hosp., 88 NY2d 784, 787 [1996]). The distinction, however, lies in the nature of the acts or omissions underlying each cause of action. A cause of action for medical malpractice involves a "matter of medical science or art requiring special skills not ordinarily possessed by lay persons" (Miller v Albany Med. Ctr. Hosp., 95 AD2d 977, 978 [3d Dept 1983]) or involving a "consideration of professional skill and judgment" (Rabinovich v Maimonides Med. Ctr., 179 AD3d 88, 93 [2d Dept 2019]).
"By contrast, when the gravamen of the complaint is not negligence in furnishing medical treatment to a patient, but the [medical provider's] failure in fulfilling a different duty, the claim sounds in negligence" (Weiner, 88 NY2d at 788 [internal quotation marks omitted]). In other words, "an action sounds in ordinary negligence when jurors can utilize their common everyday experiences to determine the allegations of a lack of due care" (Rabinovich, 179 AD3d at 93). An action may sound in both medical malpractice and ordinary negligence, depending on the underlying acts or omissions (see e.g. De Leon v Hospital of Albert Einstein Coll. of Medicine, 164 AD2d 743, 747 [1st Dept 1991]; Coursen v New York Hosp.-Cornell Med. Ctr., 114 AD2d 254, 256-258 [1st Dept 1986]).
The underlying parts of the IVF process implicate both medical malpractice and ordinary negligence. Retrieving the eggs from the ovaries, fertilizing the egg with a donated sperm, grading the quality of the embryos, and preparing them for cryopreservation are clear acts of medical science or art requiring a specialized skillset appropriately characterized as medical in nature. However, all of these acts concluded on August 11, 2008, when the embryos were cryopreserved, rendering the causes of action based on such treatment untimely (see CPLR 214-a). Further, because those processes firmly ended on that date, the continuous treatment doctrine does not toll the statute of limitations (see Nykorchuck v Henriques, 78 NY2d 255, 258 [1991]). As plaintiffs' causes of action for medical malpractice based upon these allegations are untimely, we need [*3]not address their merits.
On the other hand, once cryopreservation has commenced, the mere maintenance of the storage tanks containing the frozen embryos does not comprise acts of "medical science or art requiring special skills not ordinarily possessed by lay persons" (Miller, 95 AD2d at 978). Where an act is more "'administrative' than medical in nature," conduct is "measured by ordinary negligence standards" (id.). While the cryopreservation storage tanks at CFHR were checked at least twice weekly for leaks and the levels of liquid nitrogen, such acts are more administrative than medical in nature. Thus, once the embryos entered cryopreservation, CFHR and its employees merely owed a duty to plaintiffs to maintain the successful operability of the storage tanks.
The alleged failure in "fulfilling [this] different duty" "sounds in negligence," rather than medical malpractice (Weiner, 88 NY2d at 788 [internal quotation marks omitted]; see also Ivison v Extend Fertility, LLC, 2024 WL 263461, *6, 2024 US Dist LEXIS 12608, *14-16 [SD NY, Jan. 24, 2024, No. 23-cv-4503 (DLC)] [holding that where the claims stemmed from the alleged mishandling and loss of successfully retrieved eggs, "rather than from the retrieval process itself," the claims "sound[ed] in ordinary negligence rather than medical malpractice"]). Further, whether a duty was breached with regards to checking the operability of the storage tanks is "easily discernable by a jury on common knowledge" (Coursen, 114 AD2d at 256; see also In re Pacific Fertility Ctr. Litig., 2021 WL 862463, *2, 2021 US Dist LEXIS 44183, *7 [ND Cal, Mar. 8, 2021, No. 18-cv-01586 (JSC)] [holding that the functioning of a cryogenic tank storing embryos is not "beyond the everyday understanding of an average juror" as contended by storage tank manufacturer]).
Lastly, the use of embryologists to conduct routine examinations of the storage tanks does not transform an otherwise administrative act into one requiring medical judgment (see Weiner, 88 NY2d at 788-789 [a physician's supervision of the process of blood collection did not determine whether the act constituted medical treatment]; Dillon v Rockaway Beach Hosp., 284 NY 176, 180 [1940] [liability is not dependent on the title of the individual whose act or omission causes the purported injury, but rather the character of the act itself]). Accordingly, allegations pertaining to the storage of the embryos sound in negligence, rather than medical malpractice, and were timely interposed (see CPLR 214).
Turning to the merits of plaintiffs' allegations relating to storage of the embryos, a material issue of fact exists because of the conflicting testimony regarding the potential impact of the cryopreservation process on the embryos. At deposition, Ms. Zhong and Mr. Li, as well as Dr. Norbert Gleicher — CFHR's owner, medical director and laboratory director — all testified that embryo quality cannot change once the embryos are frozen. Plaintiffs' expert agreed, opining [*4]that "[o]nce an embryo is cryopreserved, it does not change or deteriorate if properly cryopreserved and stored" because "their cellular activity stops. No growth is possible; no change in grade can occur." Yet, defendants' own experts all disagree with them, opining that embryo degradation can occur "for a number of reasons or for no reason at all," or "for no identifiable reason." A "jury alone may weigh conflicting evidence and determine the credibility of witnesses and the weight to be accorded expert testimony" (Kallenberg v Beth Israel Hosp., 45 AD2d 177, 180 [1st Dept 1974], affd 37 NY2d 719 [1975]). Accordingly, an issue of fact precluding summary judgment exists because of the contradictory deposition testimony (see Callahan v Guneratne, 78 AD3d 753, 754 [2d Dept 2010] [summary judgment improper where the defendant doctors' submitted expert opinions contradicted the defendants' own deposition testimony]; Rizzo v Moseley, 74 AD3d 942, 944-945 [2d Dept 2010] [summary judgment properly denied where the defendant doctor's submitted expert opinion contradicted the defendant's own deposition testimony]).
Plaintiffs convincingly argue that defendants' experts improperly opined on the adequacy of the storage of the embryos. Defense expert Dr. Cristina Matera's opinion that the storage and maintenance of the embryos during cryopreservation was proper was supported solely by her experience as a physician in the field of reproductive medicine and fertility, and she provided no factual or record support. This opinion was thus conclusory and speculative (see e.g. Curry v Dr. Elenda Vezza Physician, P.C., 106 AD3d 413, 414 [1st Dept 2013] [expert opinion based solely on doctor's experience supported with "insufficient further details" or "any evidence" was speculative]).
Similarly, defendants' expert, Alexis Adler, opined that the embryos were "routinely monitored and appropriately cryopreserved" from 2008 to 2010. Ms. Adler based her opinion on routine maintenance logs from 2010 (the logs from 2008 and 2009 are purportedly "no longer in existence"), as well as testimony by Ms. Zhong and Dr. Gleicher that the storage tanks never malfunctioned or set off any alarms in 2008 and 2009. However, testimony that the tanks never malfunctioned or set off any alarms has no bearing on whether the embryos were "routinely monitored and appropriately cryopreserved," and only serves to demonstrate that there were no known emergencies during that time period. Ms. Adler's extension of this testimony in forming her expert opinion was nothing more than a speculative assumption (see e.g. Shahid v New York City Health & Hosps. Corp., 47 AD3d 800, 802 [2d Dept 2008] [expert opinion insufficient where it was "based upon a string of assumptions not supported by facts in the record"]).
Defense expert Albert Anouna opined that CFHR's "storage . . . procedures were . . . properly implemented by staff during that time." Mr. Anouna provides no factual or record basis for his [*5]opinion that the storage procedures were "properly implemented." His opinion is thus improperly speculative and conclusory (see Diaz v New York Downtown Hosp., 99 NY2d 542, 544 [2002] ["Where the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation . . . the opinion should be given no probative force"]).
Plaintiffs' expert, on the other hand, thoroughly countered defendants' experts' opinions, concluding that some of the embryos were most likely damaged during freezing and simultaneous storage. Accordingly, plaintiffs raised an issue of fact regarding the adequacy of the storage, maintenance and preservation of plaintiffs' embryos at CFHR that precludes summary judgment.
Lastly, defendants argue that no act or omission by them deprived plaintiffs of the chance of a successful pregnancy, and that any diminishment of chance was insubstantial or inconsequential. However, even though Dr. Matera opined that the chances of plaintiffs achieving a successful pregnancy at Ms. Bledsoe's age was as low as 11.1% in healthy, non-cancer patients, this low probability does not mean that any further decrease in probability was insubstantial or inconsequential (see e.g. Roeser v Essig, 177 AD3d 502, 503 [1st Dept 2019] [holding that where chances of a successful pregnancy were below 5%, this does not render any further decrease inconsequential]). When plaintiffs transferred the embryos to Yale, it was discovered that only four of the nine embryos remained viable. The loss of the other embryos diminished plaintiffs' chances of a successful IVF implantation by over 50%. Regardless, "it is for a jury to determine whether any reduction in plaintiff's chances of achieving a successful pregnancy was 'substantial'" (id., citing Stewart v New York City Health & Hosps. Corp., 207 AD2d 703, 704 [1st Dept 1994], lv denied 85 NY2d 809 [1995]).
Accordingly, the order of the Supreme Court, New York County (John J. Kelley, J.), entered December 9, 2022, which granted the motion of defendants Center for Human Reproduction, American Infertility of New York, P.C., Helen Shi Zhong, and Jaime Lee for summary judgment dismissing the complaint against them, should be modified, on the law, to the extent of reinstating plaintiffs' claims for negligence based upon allegations of improper storage, maintenance and preservation of plaintiffs' cryopreserved embryos, and otherwise affirmed, without cost.
Order, Supreme Court, New York County (John J. Kelley, J.), entered December 9, 2022, modified, on the law, to the extent of reinstating plaintiffs' claims for negligence based upon allegations of improper storage, maintenance and preservation of plaintiffs' cryopreserved embryos, and otherwise affirmed, without costs.
Opinion by Shulman, J. All concur.
Oing, J.P., González, Shulman, Pitt-Burke, Higgitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: April 18, 2024

Footnotes

Footnote 1: The IVF process entails the hormonal stimulation of a woman's ovaries to produce multiple eggs, which are then removed by laparoscopy or ultrasound-directed needle aspiration (Kass v Kass, 91 NY2d 554, 557 [1998]). Once a sperm cell fertilizes an egg, the resulting "pre-zygotes may be cryopreserved indefinitely in liquid nitrogen for later use," i.e., freezing (id.). 

Footnote 2: Dr. Oktay was granted summary judgment dismissing the complaint against him (Bledsoe v Center for Human Reproduction, 2022 NY Slip Op 33855[U] [Sup Ct, NY County 2022]. Plaintiffs did not appeal that determination. Thus, the egg retrieval process is not at issue.